[Nos. B233739, B236408. Second Dist., Div. Seven. July 18, 2012.]

CITY OF MAYWOOD, Plaintiff and Respondent, v.
LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and
Appellants.

364

## COUNSEL

David R. Holmquist, Jay F. Golida; R. Bruce Tepper; Pircher, Nichols & Meeks, Fernando Villa and Jeffrey N. Brown for Defendants and Appellants.

Law Offices of Beth S. Dorris and Beth Dorris for Plaintiff and Respondent.

## OPINION

### ZELON, J.—

### INTRODUCTION

The City of Maywood filed a petition for writ of mandate seeking to overturn the Los Angeles Unified School District's (LAUSD) decision to certify a final environmental impact report (FEIR) analyzing the environmental consequences of constructing a high school. Maywood argued that the FEIR did not satisfy the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) because it failed to adequately assess various environmental impacts and did not include a sufficient discussion of project alternatives. Maywood also alleged that the LAUSD's decision to certify the FEIR violated school siting procedures enumerated in the Education Code.

Although the trial court rejected a majority of Maywood's claims, it found that the FEIR was deficient in four ways. First, it concluded that the report failed to consider whether the design of the school campus, which was bisected by an active roadway, presented any significant impacts to pedestrian safety. Second, the court concluded that the report did not adequately assess whether the project site was contaminated with hazardous materials. Third, it found that the report failed to analyze the cumulative impacts from a planned expansion of the I-710 freeway. Fourth, the court ruled that the report did not contain a sufficient discussion of project alternatives.

The trial court entered a peremptory writ prohibiting the LAUSD from taking any further actions to approve the project until it had prepared and

certified a revised environmental impact report (EIR). In addition, the court granted a motion awarding Maywood approximately $670,000 in attorneys' fees pursuant to Code of Civil Procedure section 1021.5 (section 1021.5).

The LAUSD appeals the peremptory writ and the trial court's order awarding attorneys' fees. We affirm in part, reverse in part and remand for further proceedings. We affirm the portion of the writ requiring the LAUSD to address whether the proposed design of the project presents significant impacts to pedestrian safety. The remainder of the trial court's writ is reversed. We also reverse the trial court's order awarding attorneys' fees and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Description of the Project*

The project at issue is the construction of "South Region High School No. 8," intended to serve the LAUSD's south region planning area. The project has several objectives, including: "[r]eliev[ing] overcrowding at Bell High . . ."; "[e]liminat[ing] involuntary busing of students"; "[p]rovid[ing] multipurpose fields for students and community use outside normal school operation hours . . ."; and "[p]rovid[ing] an adult school program to serve demand in the local area while making efficient use of educational facilities."

The project site is located in the City of Maywood and consists of two city blocks approximately a half-mile from the I-710 freeway. The 8.37-acre site is bordered by 57th Street on the north, Slauson Avenue on the south, King Avenue on the west and Mayflower Avenue on the east. The site is bisected by 58th Street, which divides the campus along an east/west axis.

The proposed project would consist of 146,000 square feet of school facilities to accommodate up to 1,215 high school students. The southern block of the campus, situated south of 58th Street, will include 43 classrooms, a library, a performing arts center, a multipurpose facility, a gymnasium, a medical clinic, a food services area and additional space for maintenance and other support services.

The northern block of the campus, situated north of 58th Street, will include a lighted football/soccer stadium that will seat approximately 1,200 people, a 40,000-square-foot parking garage and a set of basketball courts located on the roof of the parking garage. The two sides of the campus will be connected by a pedestrian bridge on the east side of the project site that spans 58th Street. The bridge will be accessible from the northern side of the campus through the top level of the parking garage (where the basketball

courts are located) and will be accessible from the southern side of the campus through the gymnasium.

At the time the LAUSD announced the project, the two city blocks within the project site contained seven parcels of commercial property and 40 parcels of residential property. The commercial parcels included nine commercial units and the residential parcels included 119 units of housing consisting of 10 single-family units, 29 multifamily units and a motel.

B. *Environmental Review*

1. *Notice of Preparation and Initial Study*

In July 2009, the LAUSD issued a "Notice of Preparation and Initial Study" (NOP) announcing that it was "proposing to construct and operate a new high school on a 9.4 acre site at the northeast corner of Slauson Avenue and King Avenue, in the City of Maywood."[1] The NOP indicated that 8.65 acres of the site consisted of two city blocks bordered by 57th Street, Mayflower Avenue, Slauson Avenue and King Avenue. The remaining 0.75 acres consisted of the portion of 58th Street that ran between the two blocks, which would be vacated and incorporated into the project. The NOP was accompanied by several appendices, including a cultural resources and architectural evaluation, a geological seismic hazard report, an environmental site assessment report, a health risk assessment and a rail safety study.

The NOP concluded that the project could result in significant environmental impacts and would therefore require the preparation of an EIR. The LAUSD announced that, as part of the review process, it had scheduled a scoping meeting to allow members of the community to express their "views regarding the . . . content of the environmental information that should be included in the EIR."

During the scoping meeting, which was held on August 19, 2009, several Maywood residents and government officials informed the LAUSD that its proposed design was infeasible because Maywood would not allow the school district to close the portion of 58th Street that bisected the project site. In response to these comments, LAUSD officials stated that they were aware of "the 58th Street issue" and intended to work with Maywood to resolve the matter.

---

[1] Once a lead agency determines an EIR is required for a project, the lead agency must send the state Office of Planning and Research and affected agencies a "notice of preparation" of an EIR. (Cal. Code Regs., tit. 14, § 15082, subd. (a).) The "notice of preparation" must, at minimum, include information regarding the description of the project, its location and its probable environmental effects, to permit responsible agencies to make a meaningful response. (*Id.*, subd. (a)(1).)

Other residents and local government officials expressed concern that "an upcoming project on the 710 freeway w[ould] open up exit-ramps onto Slauson Avenue, which could greatly increase traffic in the area of the school." A member of the Maywood Planning Commission, commented that the "extension of the 710 fwy. needs to be addressed . . . since it would impact the local school sites, children and air quality." In response, the LAUSD stated that the EIR would look into the issue of the 710 exit.

Several meeting attendees also commented that the LAUSD should investigate the project site for potential ground and water contamination caused by hazardous materials. Although the NOP had concluded that the project would present no significant impacts from the potential release of hazardous materials, members of the community requested that the LAUSD conduct a more thorough analysis as part of the EIR process.

Participants expressed concerns on a wide variety of additional potential project impacts, including the displacement of Maywood residents, destruction of cultural resources, traffic and parking.

### 2. Draft Environmental Impact Report

In December of 2009, the LAUSD released its draft environmental impact report (DEIR). The project description in the DEIR indicated that the LAUSD had altered the original design of the project. Rather than incorporating 58th Street into the project site, the new design left 58th Street as an active roadway that bisected the site. The new design also included a pedestrian bridge over 58th Street connecting the northern and southern sides of the campus. The student dropoff zone would be located on the south side of 58th Street, in close proximity to the main entrance to the classrooms and other school facilities, and across the street from the football stadium and the parking garage.

### a. Summary of Areas of Controversy

As required under the CEQA guidelines,[2] the DEIR contained a chapter summarizing "areas of controversy" that had been raised by the public and other government agencies during the NOP comment period. (See Guidelines, § 15123, subd. (b)(2).) A list summarizing the "potential areas of controversy" included "cumulative impacts with the proposed I-710 expansion";

---

[2] All references to the "Guidelines" are to the CEQA Guidelines, California Code of Regulations, title 14, section 15000 et seq. Courts "should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

"Consideration of alternate sites"; "The City of Maywood will not approve the vacation of 58th Street described in the Initial Study"; "[h]azardous material that may exist onsite."

An accompanying table listed each comment received during the comment period and the section of the DEIR that addressed each comment. In response to comments that Maywood did not intend to vacate 58th Street, the DEIR referred to a section describing the current design of the project, which left 58th Street as an active roadway. In response to comments requesting that the LAUSD consider the proposed expansion of the I-710 freeway, the DEIR referred to a subchapter describing the effects on transportation and traffic. That chapter, however, contained no discussion or reference to the I-710 expansion project.

The DEIR listed numerous additional comments, including concerns about the hazardous materials, displacement of residents, loss of housing and historic buildings, lack of onsite parking, increased traffic and aesthetics.

b. *Summary of Potential Environmental Impacts*

After summarizing the areas of controversy, the DEIR analyzed several different categories of potential environmental impacts, including, in relevant part, hazardous materials, pedestrian safety and expected cumulative impacts from other current and future projects in the area.[3]

i. *Hazards and Hazardous Materials*

The DEIR subchapter on "Hazards and Hazardous Materials" stated that the NOP determined the project "would have no impact or a less-than-significant impact for all environmental . . . topics [related to] Hazards and Hazardous materials." The DEIR noted, however, that because the public had expressed concerns regarding potential impacts from hazardous materials, the LAUSD elected to include "a more detailed discussion of the potential impacts associated with those topics."

The DEIR explained that, pursuant to school siting requirements in the Education Code, the LAUSD was working with California's Department of Toxic Substances Control (DTSC) to conduct an environmental evaluation and remediation of the project site. As part of that process, the LAUSD had

---

[3] The DEIR discussed numerous other environmental categories that are not relevant to this appeal, including aesthetics, air quality, cultural resources, greenhouse gas emissions, hydrology and water quality, noise, population and housing and public services. The NOP listed seven additional categories of environmental impacts that were not addressed in the DEIR because the NOP determined that the project would have no potential impacts in those areas.

conducted a phase I environmental assessment (ESA), a preliminary endangerment assessment (PEA), a health risk assessment and a rail safety study.

The DEIR further explained that the initial ESA revealed several potential contamination hazards on and off the project site, which included four industrial facilities and residential structures that exhibited the potential for lead-based paint and termiticide contamination. Based on these areas of concern, the LAUSD conducted a PEA that included a soil analysis of the project site. The PEA analyzed hundreds of soil samples taken from the nine commercial parcels and several of the residential parcels located on the project site. The DEIR noted that because the LAUSD had been unable to secure "access agreements" for 27 of the residential properties, no testing had occurred on those particular parcels. The report also indicated, however, that the DTSC had ordered the LAUSD to test those sites once it had gained access to the properties.

The DEIR further explained that the results of the PEA showed that the project site had an estimated cumulative cancer risk that "exceed[ed] the DTSC target-risk screening goal." Under the Education Code, this finding required LAUSD to complete further steps "in investigating, assessing and remediating the project's sites environmental conditions," which included (1) preparing a supplemental site investigation that would have to be reviewed and approved by the DTSC; (2) preparing a removal action workplan (RAW) to remediate or remove any contaminated soil, which would also need to be approved by the DTSC; and (3) "perform[ing] the removal action . . . consistent with the DTSC's cleanup standards and other performance criteria and under [the DTSC's] oversight." Finally, prior to construction, the LAUSD would have to obtain "the DTSC's review and approval . . . [that] the site's condition will not significantly threaten the health and safety of workers, students, and adults."

The DEIR concluded that "[w]ith the implementation of the required response actions as approved by DTSC, such as conducting additional investigation and completing the RAW under the DTSC oversight, the proposed project would have a less than significant hazardous materials impact to the public and the environment."

ii. *Pedestrian Safety Issues*

The DEIR included a subchapter addressing potential impacts to pedestrian safety. The report concluded that "[i]ncreased levels of traffic and pedestrians on local roadways, along with increased vehicular turning movements at intersections, driveways and curbside parking could increase the risk of conflicts between vehicles and pedestrians." A traffic and safety study found

that these pedestrian safety issues could be mitigated by installing traffic signals, crosswalk striping and school crossing signs at various intersections around the exterior of the project site, as well as "passenger loading" signs in the designated dropoff and pick up areas.

The DEIR further concluded, however, that the implementation of such mitigation measures was "under the jurisdiction of another agency (City of Maywood) and therefore [could not] be guaranteed by LAUSD. Therefore, pedestrian safety impacts would remain significant and unavoidable until mitigation measures are implemented."

The subchapter on pedestrian safety did not discuss whether students and staff would be endangered by the fact that 58th Street bisected the project site or whether the proposed pedestrian bridge would adequately mitigate any such hazards.

### iii. *Discussion of Cumulative Impacts*

Each subchapter in the environmental analysis section of the DEIR included a discussion of "cumulative impacts" that might occur as "a result of past, present and reasonably foreseeable future projects" located in the same geographic area. The DEIR contained a list of 12 "approved and pending projects" that were considered for the purposes of the cumulative impact analysis. The DEIR did not include the expansion of the I-710 as a reasonably foreseeable project nor did it explain why it had not considered the I-710 project in its analysis.

### c. *Alternatives to the Project*

The DEIR contained a 43-page chapter describing six possible alternatives to the project which included one "No Project/No Build" alternative, one "Reduced Project" alternative and four alternatives that utilized different project sites. The DEIR also included a list of approximately 50 additional sites that were considered during the review process, but were ultimately deemed improper for inclusion in the DEIR.

The "Reduced Project Alternative" consisted of a high school located on the same project site "that would require 25 percent less land and would have 25 percent less capacity than the Proposed Project." This alternative would accommodate approximately 300 fewer students and would not include a football stadium. The DEIR concluded that although the reduced project alternative would have less significant impacts in numerous different environmental categories, it would not relieve overcrowding at Bell High School to the same extent as the proposed project.

One of the four alternative project sites discussed in the DEIR was "Site No. 26," which was located in a commercial area of Vernon, California. Site No. 26 was approximately the same size as the proposed project site and would include the same facilities. The DEIR concluded that because Site No. 26 was surrounded by commercial parcels, it would require no residential displacements and impose less significant impacts in terms of noise and aesthetics. The DEIR further concluded, however, that the site would have greater impacts on pedestrian safety due to "a high volume of truck traffic." The DEIR also stated that impacts from hazards and hazardous materials would be greater because the site was currently used for industrial and commercial purposes and was surrounded by similar land uses.

### d. *Comments to the DEIR*

During the public comment period for the DEIR (see Pub. Resources Code, § 21091), Maywood raised several of the same objections asserted in response to the NOP.[4] For example, Maywood asserted that the DEIR failed to address "the impacts of the planned Slauson Avenue/I-710 Freeway interchange." According to Maywood's engineering expert, "[t]he new ramps will modify traffic circulation in the area and are expected to bring additional traffic, especially truck traffic, to Slauson Avenue in the project vicinity."

Maywood also argued that the DEIR did not contain a sufficient discussion of potential impacts from hazardous materials. Maywood noted that the DEIR indicated that the LAUSD had "tested the soils conditions at only roughly half the lots, and almost none of the residential properties [in the project site]." Moreover, the DEIR included no discussion explaining site cleanup.

Maywood further asserted that the DEIR should include a "reduced project" alternative that retained the same number of classrooms as the proposed project while reducing nonclassroom facilities. According to Maywood, the LAUSD's reduced project alternative—which would service 25 percent less students than the proposed project—was a "straw man" option "designed to fail from the outset." Maywood also asserted that the DEIR should provide "[f]urther consideration of rejected Alternative Site No. 26 for the proposed school" and assess several alternative sites that had been proposed during the school site selection process.

Maywood also raised questions about the safety of the redesigned campus, indicating that it had "serious safety concerns about the design of the campus

---

[4] Maywood submitted three separate comment letters, including a 12-page letter from its director of building and planning, a 17-page letter from its counsel and a 9-page letter from an engineering consultant Maywood hired to analyze the LAUSD's traffic and pedestrian safety study.

with a busy truck-laden street running down the middle and no effective way to prevent teens from jaywalking." Maywood's engineering expert concluded that the LAUSD's traffic and safety study failed to analyze whether "students/staff would use the bridge instead of crossing at ground level."

Finally, Maywood asserted that the DEIR failed to adequately analyze numerous additional categories of environmental impacts, including, in part effects on displaced residents, destruction of cultural resources, aesthetics, air quality, earth and geology, parking, land use and planning, pedestrian safety, traffic, public services, recreation, utilities and climate change.

### 3. Summary of the Final EIR

In February of 2010, the LAUSD issued its FEIR, the substantive content of which was essentially identical to the DEIR. The FEIR included a chapter identifying all of the changes from the DEIR, which consisted of line edits and minor alterations to traffic flow data. (See Guidelines, § 15132, subd. (a) ["The final EIR shall consist of: [¶] (a) The Draft EIR or a revision of the draft."].) As required under the CEQA Guidelines, the FEIR also included several new chapters including, in relevant part, a chapter summarizing and responding to all comments received on the DEIR and a section detailing mitigation efforts necessary to reduce significant effects on the environment. (See Guidelines, § 15132.)

#### a. Summary of Significant and Unavoidable Environmental Impacts

The FEIR concluded that the project would produce significant unavoidable environmental impacts in three areas: pedestrian safety, noise and parking. The FEIR explained that although the pedestrian safety issues could be mitigated by implementing various traffic signs and signals, LAUSD could not guarantee the implementation of those measures, which were under the jurisdiction of Maywood. Thus, the pedestrian safety impacts would remain significant and unavoidable unless and until Maywood agreed to such mitigation measures.

#### b. The LAUSD's Response to Comments

The FEIR included a 350-page chapter summarizing and responding to comments on the DEIR, 75 pages of which responded to written comments submitted by Maywood. In response to Maywood's assertion that the DEIR failed to consider pedestrian safety impacts presented by 58th Street, the LAUSD noted that "[s]tudents would be required to use the bridge to cross 58th Street, and would be prohibited from crossing 58th Street at street level.

Because the bridge provides the most direct access to the on-site parking garage, teachers would use the bridge for their primary access to the main school area on the southern block. Crosswalks on 58th Street would be signed with 'school crossing' signs, as well as striped with high-visibility striping appropriate for school areas."

In responding to Maywood's comments about alternative sites, the FEIR explained that it had not considered a "reduced project" alternative that maintained the same number of classrooms while reducing the overall acreage of the project because any such configuration would violate State Department of Education policies governing maximum student per acre density requirements. The FEIR also explained why it had rejected various alternatives, including Site No. 26. According to the FEIR, the LAUSD concluded that Site No. 26 would present greater potential impacts in the areas of pedestrian safety and hazardous materials than the proposed project.

With regard to comments regarding the DEIR's failure to consider the cumulative impacts of the I-710 freeway expansion project, the LAUSD stated that the expansion project was still in the early planning stages and therefore did not qualify as a "reasonably foreseeable" future project.

Finally, in regard to comments questioning the analysis of impacts from hazardous materials, the FEIR posited that the LAUSD was permitted to conduct a more detailed investigation and remediation of the project site after the EIR process was completed. The FEIR contended that the LAUSD had fully complied with its duties under CEQA by conducting a preliminary investigation of the environmental condition of the project site and committing itself to a remediation plan that would be overseen by the DTSC.

In March 2010, the LAUSD issued a statement of overriding considerations and findings of fact approving the project despite the fact that it would impose unavoidable significant impacts on pedestrian safety, noise and parking. The LAUSD formally approved the project and certified the FEIR on March 11, 2010.

### 4. *Addendum to the FEIR*

Shortly before the LAUSD certified the FEIR and approved the project, the State Department of Education (CDE) issued a letter informing the district that the site did not comply with "Title 5" school siting standards. (See Cal. Code Regs., tit. 5, § 14010.)[5] The letter explained that the FEIR found the

---

[5] Under California Code of Regulations, title 5, section 14011, LAUSD was not permitted to actually acquire the school site until it had approval from CDE.

project would result in unavoidable significant impacts on pedestrian safety. According to CDE, because the LAUSD could not guarantee necessary mitigations, it had failed to comply with a siting requirement mandating "the mitigation of traffic hazards." (Cal. Code Regs., tit. 5, § 14010, subd. (*l*).) The CDE indicated that, after LAUSD approved the FEIR, it would reevaluate whether LAUSD had demonstrated that it could assure mitigation of the pedestrian hazards.

In July 2010, the LAUSD released an "addendum" to the FEIR and a revised findings of fact and statement of overriding considerations concluding that the project would not have an unavoidable and significant impact on pedestrian safety. The addendum concluded that Vehicle Code sections 21372 and 21373 would enable LAUSD to require Maywood to implement the traffic controls necessary to mitigate pedestrian traffic hazards. According to the addendum, "[t]hese statutes require the City of Maywood . . . to implement the mitigation measures identified in the EIR, which would eliminate the significant and unavoidable pedestrian safety impacts."

The CDE found that, with the addendum to the FEIR, the LAUSD had adequately demonstrated that "the site will meet the Title 5 site approval standards."

### C. City of Maywood's Petitions for Writ of Mandate

#### 1. Summary of Petition for Writ of Mandate Challenging the Original FEIR

In April 2010, the City of Maywood filed a petition for writ of mandate alleging that the LAUSD had (1) failed to comply with CEQA procedures governing the preparation of an environmental impact review and (2) violated "Education Code requirements for siting . . . new school facilities."

The CEQA cause of action asserted that the FEIR failed to "sufficiently address" a wide range of "potential adverse impacts to the environment," including, in part, (1) the extent to which the site was contaminated by hazardous materials; (2) "the cumulative impacts of the new Slauson on/off ramp at the I-710 Major [c]orridor project"; (3) "the pedestrian risks to high school students associated with [a] street bisecting the campus"; (4) "impacts associated with the cultural historic and architectural significance of structures on the Proposed Maywood Site"; (5) "greenhouse gas emissions impact[s]"; (6) "traffic and parking impacts"; (7) "light, glare and noise" impacts for the "sports field"; and (8) "the effect of removing residences for about 116 families . . . from Maywood." The petition also alleged that the

FEIR failed to "provide a reasonable range of [project] alternatives." In total, the petition alleged the FEIR violated CEQA in over two dozen ways.[6]

Maywood's second cause of action alleged that the LAUSD had "failed to comply with the [new school siting] procedures set forth in Education Code sections 17210 et seq." In particular, Maywood alleged that the Education Code prevented the LAUSD from approving the project until it had conducted hazardous materials testing on each parcel of property on the project site and completed a full remediation of any such contamination. The petition also alleged that the LAUSD's failure to adequately investigate pedestrian safety issues and alternative project sites violated the Education Code.

### 2. Maywood's Petition for Writ of Mandate Challenging the FEIR Addendum

On August 12, 2010, the city filed a second petition for writ of mandate, which was assigned a separate case number. The petition sought to invalidate the addendum to the FEIR and any subsequent actions to approve the project site. The petition argued that, under CEQA, LAUSD was required to circulate a "revised" EIR and "revised" CEQA findings prior to approving the addendum. The petition further asserted that, like the FEIR, the addendum did not address potential pedestrian hazards associated with the design of the school, which was bisected by an active roadway. According to Maywood, the addendum's conclusion that the project would not create any significant impact to pedestrian safety was not supported by substantial evidence.

The petition also included non-CEQA related claims alleging that the LAUSD violated provisions of the Maywood Municipal Code, including zoning ordinances and a recently passed historic preservation ordinance.

### 3. Maywood's Memorandum in Support of Its Petition for Writ of Mandate

On November 1, 2010, Maywood filed a memorandum in support of its initial petition for writ of mandate, which set forth five primary arguments. First, Maywood contended that the FEIR did not consider a reasonable range of project alternatives or adequately explain why the LAUSD had refused to consider alternatives set forth in Maywood's written comments. In particular, Maywood argued that the LAUSD had a mandatory duty to consider "reduced project" alternatives that would reduce the size of the school's facilities while maintaining the same number of overall classrooms. In addition,

---

[6] A "statement of issues" filed by Maywood listed 26 different issues regarding the manner in which the FEIR allegedly failed to comply with CEQA. (Pub. Resources Code, § 21167.8, subd. (f).)

Maywood argued that the LAUSD did not provide sufficient detail or analysis of the alternative sites that were discussed in the FEIR.

Second, Maywood argued that the FEIR failed to address or mitigate the significant impacts associated with destroying cultural, historic and architectural resources in the "long standing Slauson Neighborhood." Maywood asserted that "the most notable example of this fatal flaw" was the EIR's "total failure" to consider the "Winans House," which was allegedly designed and built by a notable architect and designated as a cultural resource under local ordinance.

Third, Maywood argued that the LAUSD failed to assess whether the design of the school campus presented impacts on pedestrian safety. Although Maywood acknowledged that the design incorporated a pedestrian bridge spanning 58th Street, it contended that LAUSD made no effort to review whether this design element would effectively address potential safety issues caused by the presence of an active roadway in the middle of the campus site.

Fourth, Maywood argued that the FEIR failed to properly assess traffic, parking and pedestrian safety impacts because it did not "identify and study as a related project the I-710 [c]orridor project of Caltrans." Maywood further asserted that the FEIR failed to assess the safety of numerous traffic intersections near the project site or to adequately consider mitigation of parking problems.

Finally, the city argued that the FEIR contained no evidence to support the LAUSD's finding that the condemnation of numerous residential properties would have no significant impacts on the population and housing availability in Maywood.

In addition to its CEQA arguments, Maywood's brief argued that the LAUSD had violated Education Code requirements pertaining to the siting of new schools. First, Maywood contended that the LAUSD was required to conduct various "environmental assessment" procedures before approving the school site, including (1) testing each individual parcel of property for hazardous materials contamination and (2) drafting and implementing a remediation work plan describing how the District would clean the project site. Second, Maywood asserted that several of the acts that had allegedly violated CEQA, including the LAUSD's failure to adequately investigate pedestrian hazards or project alternatives, also violated Education Code siting requirements.

### D. *The Trial Court's Ruling on the Petitions for Writ of Mandate*

On March 16, 2011, the trial court heard Maywood's petitions for writ of mandate challenging the LAUSD's certification of the FEIR and the certification of the addendum. The court informed the parties that it had elected to consider the CEQA arguments Maywood raised in relation to the FEIR addendum—which appeared in the second petition—as part of the first petition for writ of mandate. The remaining arguments set forth in the second petition, which pertained to the LAUSD's alleged violation of local ordinances, would be considered separately.[7] After argument, the court granted, in part, the first petition and denied the second petition.

The trial court's written order identified "three different ways . . . [in which the] EIR and environment review process did not satisfy statutory and regulatory requirements."[8] First, the court found that the FEIR failed to adequately assess whether the design of the project would impact pedestrian safety. Specifically, the court concluded that the FEIR failed to consider whether students and other pedestrians would be endangered by the active street that bisected the campus or whether the pedestrian bridge would adequately mitigate any such dangers. The court explained that although the LAUSD prepared a safety study analyzing potential hazards to pedestrians traveling to the campus, the study did not assess the safety of pedestrian "movement . . . once on campus." According to the court, the record did not contain "even a scintilla of empirical evidence regarding [the] efficacy [of pedestrian] bridges," rendering it "impossible to know whether the mitigation proposed here would be effective." The court added that the pedestrian safety issues were "compounded" by the DEIR's failure to evaluate the "cumulative effect of a new off-ramp onto Slauson Avenue from the I-710 corridor which will add additional traffic into this school zone."

The trial court noted that the addendum to the FEIR, which was issued in July 2010, did not address these issues. Instead, the addendum merely concluded that the LAUSD could utilize sections of the Vehicle Code to force Maywood to implement the traffic control measures needed to reduce hazards to pedestrians walking to the school site. According to the court, the addendum did not contain any information pertaining to potential pedestrian

---

[7] The parties did not object to this procedure nor have they challenged that procedure in this appeal.

[8] The court explained that, "among the plethora of arguments that were submitted in support of [Maywood's] CEQA petition," it concluded that there were only three "valid challenges." The court added it found many of the city's arguments to be "silly" and instructed the parties that they should assume that if the court's order "hadn't considered" a particular issue, it was because the court found the issue to be "with[out] merit." The trial court's written order reiterated these remarks, explaining that "to the extent that a certain objection is not discussed, the Court does not believe the Respondents have violated CEQA."

hazards caused by the location of 58th Street, and therefore did not alleviate the defects in the initial FEIR.

Second, the court found that the FEIR did not contain an adequate discussion of project alternatives. The court agreed with Maywood's assertion that the LAUSD should have considered a "reduced project" alternative that retained the same number of classrooms while eliminating additional non-classroom facilities. The court also found that the FEIR should have contained a more "detail[ed]" examination of Site No. 26, explaining: "[LAUSD's] conclusion regarding alternative no. 26, that it would 'have greater impacts associated with pedestrian safety, land use, and hazards and hazardous materials,' tha[n] the proposed Maywood site, is simply unsupported by substantial evidence."

Third, the court ruled that the FEIR did not adequately investigate potential impacts from hazardous material contamination at the project site. The court emphasized that the LAUSD failed to conduct contamination testing on numerous parcels within the project site: "As far as almost half of the property at issue is concerned, there is no information in the EIR regarding any potential for the release of hazardous and/or toxic waste in the soil and groundwater at these locations during the construction phase of this project, or afterward." It also ruled that the record lacked "substantial evidence [demonstrating] . . . that the disturbance of currently unknown amounts of contaminated soils and groundwater can be mitigated to a point where it is not a substantial impact."

The court also ruled that the LAUSD's certification of the FEIR violated Education Code sections 17211 and 17213.1, which require school districts to take certain actions before acquiring a school site. The court concluded that, under these statutes, the district was prohibited from approving the FEIR until it had (1) adequately investigated pedestrian hazards caused by 58th Street, (2) prepared a financial analysis detailing the costs of conducting a site cleanup, and (3) obtained the CDE's approval of the project site.

The trial court entered a peremptory writ that prohibited the LAUSD from taking any further actions to approve the project until it had prepared and certified a revised EIR. Shortly thereafter, the city filed a motion for attorneys' fees pursuant to Code of Civil Procedure section 1021.5. The court granted the motion and awarded the city approximately $670,000 in attorneys' fees. The LAUSD filed timely appeals of the peremptory writ and the order awarding attorneys' fees.

## DISCUSSION

### A. Summary of CEQA and Standard of Review

■ "CEQA is codified at Public Resources Code section 21000 et seq. . . . [and] is augmented by the state CEQA Guidelines, codified at title 14 of the California Code of Regulations section 15000 et seq." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1197 [22 Cal.Rptr.3d 203].) " 'With certain exceptions, CEQA requires public agencies to prepare an EIR for any project they intend to carry out or approve whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental effect . . . .' [Citation.] The California Supreme Court has 'repeatedly recognized that the EIR is the "heart of CEQA." [Citations.] "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' " ' " (*Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1169 [136 Cal.Rptr.3d 351], fn. omitted, quoting *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).)

The standard of review applicable to "challenges to the certification of an EIR" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390 [133 Cal.Rptr.2d 718]) is "well-established: 'If the substantive and procedural requirements of CEQA are satisfied, a project may be approved even if it would create significant and unmitigable impacts on the environment. [Citation.] "In reviewing an agency's determination under CEQA, a court must determine whether the agency prejudicially abused its discretion. [Citation.] Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence." [Citation.] Courts are "not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an information document." [Citation.] " 'The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it.' " [Citation.]' [Citation.]" (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 897 [98 Cal.Rptr.3d 137] (*Long Beach*).)

■ " ' " 'The EIR must contain facts and analysis, not just the bare conclusions of the agency.' [Citation.] 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " [Citations.] "CEQA requires an EIR to reflect a good faith effort at full disclosure;

it does not mandate perfection, nor does it require an analysis to be exhaustive." [Citation.]' [Citation.] 'The question whether an EIR is sufficient as an informative document depends on the lead agency's . . . compliance with CEQA's requirements for the contents of an EIR: whether the EIR reflects a reasonable, good faith effort to disclose and evaluate environmental impacts and to identify and describe mitigation measures and alternatives; and whether the final EIR includes reasonable responses to comments on the draft EIR raising significant environmental issues. [Citations.]' [Citation.] 'Analysis of environmental effects . . . will be judged in light of what was reasonably feasible.' [Citation.]" (*Long Beach, supra*, 176 Cal.App.4th at pp. 897–898.)

"Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown." [Citations.]" (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1391.) " 'Failure to comply with the information disclosure requirements constitutes a prejudicial abuse of discretion when the omission of relevant information has precluded informed decisionmaking and informed public participation, regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements. [Citations.]' [Citation.]" (*Long Beach, supra*, 176 Cal.App.4th at p. 898.)

"We apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions. [Citation.] ' "Substantial evidence" ' is defined as ' " 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' " ' 'Substantial evidence is not "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment . . . . Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." ' [Citations.]" (*Long Beach, supra*, 176 Cal.App.4th at pp. 898–899.)

"As our Supreme Court succinctly put it, 'an agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. [Citation.] Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's

substantive factual conclusions.' [Citation.]" (*Long Beach, supra,* 176 Cal.App.4th at p. 899, quoting *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

### B. *The LAUSD Failed to Analyze Potential Pedestrian Safety Impacts Caused by the Continued Operation of 58th Street*

The trial court concluded that the FEIR did not adequately assess whether the design of the project impacted pedestrian safety. More specifically, the court concluded that the LAUSD failed to investigate whether the presence of an active roadway bisecting the campus, traversed by a pedestrian bridge, would have significant impacts on pedestrian safety.

#### 1. *Factual Summary*

##### a. *The DEIR's Analysis of Impacts on Pedestrian Safety*

As described in the NOP, the LAUSD originally intended to incorporate 58th Street into the project site and create a single, undivided campus. After the NOP was released, however, Maywood submitted comments objecting to the closure and vacation of 58th Street. Prior to issuing the DEIR, the LAUSD elected to redesign the campus. The project description in the DEIR showed that the new design would leave 58th Street as an active roadway and include a pedestrian bridge that would connect the southern half of the campus and the northern half of the campus. The entrances to the bridge would be located on the basketball courts located above the parking structure on the northern side of the campus, and in the gymnasium on the southern side of the campus.

Subchapter 3H of the DEIR analyzed whether the project would have any significant impacts on pedestrian safety. The findings in subchapter 3H were predicated on a "Traffic, Parking and Pedestrian Safety Study" prepared by LAUSD's transportation consultant, which was attached as an appendix. The DEIR and safety study discussed two primary issues related to pedestrian safety. First, they considered whether the design of the entrances, access points and dropoff zones presented any pedestrian hazards. The safety study concluded that the positioning of these areas complied with LAUSD construction guidelines[9] and, as a result, the school design would have no significant impact on pedestrian safety.

---

[9] These "design" guidelines include technical details about the positioning of dropoff areas, entrances, access points and surrounding sidewalks. For example, the LAUSD guidelines mandate that a school design incorporate the following requirements: "a minimum of 8 foot

The second topic considered in subchapter 3H and the safety study was whether the project created "unsafe routes to schools for students walking from local neighborhoods." The safety study examined the sufficiency of "existing pedestrian routes in close proximity to the school site" and the "traffic controls that could be used by students to access the proposed school site from adjacent neighborhoods." The study concluded that several intersections near the project site lacked sufficient traffic controls, which would have a significant impact on the safety of pedestrians traveling to the school. To mitigate these impacts, the study recommended the implementation of "pedestrian safety improvements" on various roadways around the exterior of the site. The DEIR and the safety study concluded that if Maywood agreed to implement these proposed improvements—which consisted of traffic signals, traffic signs and crosswalk striping—the impacts to pedestrian safety would be less than significant.

After the DEIR was released, Maywood submitted comments asserting that the LAUSD failed to analyze whether 58th Street would present any hazards to students and whether the pedestrian bridge would effectively address such hazards. A letter from Maywood's counsel stated that the city had "serious safety concerns about the design of the campus with a busy truck-laden street running right down the middle and no effective way to prevent teens from jaywalking." Maywood's counsel also argued that, in discussing prior school projects, LAUSD had made "public statements . . . about the uncontrollable tendency of teens to jaywalk instead of simply using a pedestrian bridge thus imperiling their safety. . . . [¶] The bottom line is that the pedestrian bridge is not safe enough . . . [and] will not prevent high school students from jaywalking."

Maywood's engineering and traffic expert concluded that the LAUSD's safety study failed to consider whether the pedestrian bridge would prevent pedestrians from crossing 58th Street: "It is not clear that students/teachers would use the pedestrian bridge instead of crossing 58th Street at ground level. People in general, and students in particular, typically take the shortest route when traveling from one place to another. The study should note how the pedestrian bridge would be situated and discuss the reasons why/why not the students/staff would use the bridge instead of crossing at ground level. The issue of pedestrians crossing 58th Street at ground level should be addressed in the pedestrian study."

wide sidewalks along loading areas"; "school access driveways and passenger loading areas shall be separated by a minimum distance of 60 feet"; "bus loading areas shall not overlap with car loading areas."

### b. The FEIR's Discussion of Impacts on Pedestrian Safety

Despite Maywood's comments, the LAUSD's FEIR did not make any substantive changes to the DEIR's subchapter on pedestrian safety. The LAUSD also chose not to revise the pedestrian safety study to consider impacts associated with 58th Street and the pedestrian bridge.[10] The FEIR did, however, include responses to Maywood's comments about the issue.

The FEIR's responses explained that the "[d]esign of the Proposed South Region High School No. 8 Project was altered subsequent to the posting of the Initial Study. Specifically, the project was reconfigured in order to accommodate continued operation of 58th Street across the middle of the proposed campus. The timing of this change in design is consistent with Section 15063 of the CEQA Guidelines which describes that the purposes of the Initial Study are to 'enable the applicant or Lead Agency to modify a project before the EIR is prepared. . . .' LAUSD altered the design prior to posting the Notice of Availability for the DEIR because of 1) comments and concerns provided by the City of Maywood and other interested parties during the public review period for the Initial Study regarding the feasibility of closing 58th Street, and 2) the addition of 58th Street would help to mitigate potentially significant parking impacts associated with the Proposed Project. [¶] The DEIR evaluated potential environmental impacts associated with the current project design in accordance with Section 15124 of the CEQA Guidelines. [¶] Impacts associated with safe routes to schools and pedestrian safety were evaluated in Subchapter 3H, Pedestrian Safety, of the DEIR. . . ."

The responses also asserted that the pedestrian bridge alleviated any safety issues arising from the design of the project: "The Proposed Project includes a pedestrian bridge that will link the northern and southern portions of the of the project site without requiring pedestrians to cross 58th Street in conflict with vehicular traffic. This bridge is shown in Figure 2-6 of the DEIR.[11] Potential environmental impacts created by the current project design were evaluated and presented in the DEIR, including potential impacts related to pedestrian safety. It should be noted that during school hours and during extra-curricular activities, all pedestrian traffic between that two parts of the campus would use a pedestrian bridge over 58th Street. Pedestrian traffic travelling to and from the school site would use crossings at the intersection of 58th Street and Mayflower Avenue and 58th Street and King Avenue. These intersections are four-way, stop controlled, and have marked crosswalks."

---

[10] The only revisions to the traffic and pedestrian safety study consisted of minor alterations to traffic flow data.

[11] Figure 2-6 is a schematic drawing of the entire project, which shows a bridge running across 58th Street near the eastern boundary of the site, connecting the gymnasium on the southern side of the campus to the basketball courts on the northern side.

Another response stated: "[W]ith regard to concerns relating to pedestrian safety as it pertains to the Proposed Project site and the operation of 58th Street, during school hours and after-school activities, access between the north part of the campus and the south part of the campus would be restricted to pedestrians using the pedestrian bridge. Individuals using the parking structure also would travel to and from the parking structure using the pedestrian bridge." The LAUSD added that "[s]tudents would be required to use the bridge to cross 58th Street, and would be prohibited from crossing 58th Street at street level. Because the bridge provides the most direct access to the on-site parking garage, teachers would use the bridge for their primary access to the main school area on the southern block. Crosswalks on 58th Street would be signed with 'school crossing' signs, as well as striped with high-visibility striping appropriate for school areas."

> 2. *The FEIR Fails to Analyze or Address Potential Pedestrian Safety Impacts Associated with the Continued Operation of 58th Street*

LAUSD argues that the trial court erred in concluding that the FEIR fails as an informational document because it did not address whether the continued operation of 58th Street and the incorporation of a pedestrian bridge would present a significant impact to pedestrian safety. To resolve this issue, we must decide two questions: (1) Did the LAUSD have a duty to investigate whether the presence of an active roadway traversed by a pedestrian bridge presented potential impacts to pedestrian safety? (2) If the LAUSD had such a duty, does the FEIR adequately address the issue?

> a. *The LAUSD Concedes That It was Required to Evaluate Pedestrian Safety Impacts Caused by the Design of the School*

The LAUSD concedes that it had a duty to consider whether the design of the project, which leaves 58th Street as an active roadway traversable by a pedestrian bridge, presented significant impacts to pedestrian safety. The FEIR states that LAUSD criteria applicable to new school project sites require an EIR to evaluate whether the project "substantially increase[s] . . . pedestrian safety hazards due to a design feature."

LAUSD's concession is well taken. CEQA requires that an EIR include a "detailed statement" setting forth the "significant effects on the environment of the proposed project." (Pub. Resources Code, § 21100, subd. (b)(1).) It also requires that an EIR "contain a statement briefly indicating the reasons that various possible significant effects of a project were determined not to be significant and were therefore not discussed in

detail." (Guidelines, § 15128.) "[A] 'significant effect on the environment' under CEQA is a substantial or potentially substantial adverse change in the physical conditions existing within the area affected by the project." (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 185 [49 Cal.Rptr.3d 169].) As LAUSD acknowledges, these provisions required LAUSD to consider whether the design features of its project—including the presence of an active roadway running through the middle of the project site and the incorporation of a pedestrian bridge—created risks to pedestrians in and around the project site.

■ The LAUSD also had an independent duty under CEQA to adequately respond to Maywood's comments regarding the design of the project. The CEQA Guidelines provide that an agency must evaluate and respond to timely comments on the DEIR that raise significant environmental issues. (Pub. Resources Code, § 21091, subd. (d); Guidelines, § 15088.) Responses must describe the disposition of the issues raised in the comments. (Pub. Resources Code, § 21091, subd. (d)(2)(B); Guidelines, § 15088.) If the agency rejects a recommendation or objection concerning a significant environmental issue, the response must explain the reasons why. (Guidelines, § 15088, subd. (c).) Responses must articulate " 'good faith, reasoned analysis in response,' and not mere '[c]onclusory statements unsupported by factual information.' [Citations.]" (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 475 [134 Cal.Rptr.3d 194].)

 b. *The FEIR Does Not Contain Any Evidence Demonstrating That the LAUSD Investigated or Addressed Pedestrian Safety Hazards Related to 58th Street*

LAUSD argues that the FEIR and the pedestrian safety study contain substantial evidence demonstrating that it adequately investigated potential safety hazards caused by the location of 58th Street and the incorporation of a pedestrian bridge. Alternatively, the LAUSD argues that the record contains evidence demonstrating that the project includes design features that will force students and staff to use the pedestrian bridge when crossing 58th Street, thereby negating any potential hazards caused by the roadway.

 i. *The FEIR and the Safety Study Did Not Analyze Pedestrian Hazards Associated with 58th Street or the Pedestrian Bridge*

LAUSD asserts that subchapter 3H of the FEIR and the pedestrian safety study "expressly took in to account" whether the "Project features and elements, *including the bisection of the Project campus by 58th Street and the*

*pedestrian bridge*," would present hazards to pedestrians. (Original italics.) We disagree. A review of the FEIR and the record make clear that subchapter 3H and the safety study focused on two types of pedestrian hazards: (1) hazards that pedestrians might encounter while traveling to the school from adjacent neighborhoods (dangerous intersections, lack of traffic signals, crosswalks, etc.) and (2) hazards associated with the placement and design of student dropoff zones, parking entryways and entrances to the school. Subchapter 3H and the safety study concluded that people traveling to the school site would encounter numerous intersections that did not contain sufficient traffic controls and recommended safety improvements to mitigate those hazards. Subchapter 3H and the safety study do not discuss whether the presence of an active roadway in the middle of the campus would impact pedestrian safety, nor do they discuss whether the pedestrian bridge would alleviate any such hazards.

The LAUSD, however, maintains that its expert did in fact "[take] into account" 58th Street and the pedestrian bridge when assessing safety impacts and concluded that any such hazards could be fully mitigated. In support of this assertion, the LAUSD cites to the introduction of the safety study, which contains a "project description" stating that "58th Street would . . . bisect the project site from east to west" and that "the project would be built on two blocks, separated by 58th Street, and linked with a pedestrian bridge." Although these statements demonstrate that the expert acknowledged that 58th Street would remain as an active roadway traversed by a pedestrian bridge, they do not show that the expert studied or considered the safety of those design features.[12]

ii. *The Record Contains No Evidence Demonstrating That Pedestrians Will Be Forced to Use the Pedestrian Bridge When Crossing 58th Street*

LAUSD next argues that, even if the FEIR failed to specifically discuss pedestrian safety impacts caused by 58th Street, the record nevertheless shows that the project includes design features that will force pedestrians to use the pedestrian bridge as the exclusive means of accessing the northern side of the campus. More specifically, LAUSD asserts that the FEIR includes

---

[12] LAUSD argues at length that "CEQA entitles the District to rely on its own expert's opinion that the Pedestrian Safety Mitigation Measures will reduce pedestrian safety to insignificance." While it is true that the LAUSD was entitled to rely on the conclusions of its experts, the evidence here demonstrates that the LAUSD's expert did not study potential hazards caused by 58th Street. The expert concluded that hazards to pedestrians traveling to the school site from adjacent neighborhoods could be mitigated with the implementation of traffic controls at intersections around the exterior of the site. The expert did not conclude that these measures would mitigate hazards associated with the presence of a roadway bisecting the campus.

information demonstrating that the northern part of the campus will be surrounded by "secured fencing, preventing students from having unauthorized access to 58th Street." According to the LAUSD, because this fencing will force pedestrians "to cross 58th Street . . . by way of the bridge . . . the Project is not going to generate significant safety impacts."

The LAUSD cites two sections of the FEIR in support of its assertion that fencing will force students and staff to use the pedestrian bridge when traveling between the northern and southern parts of the campus: (1) LAUSD's responses to Maywood's comments regarding 58 Street and (2) a "site plan" map that contains a diagram of the proposed project. Neither section of the FEIR contains any evidence that fencing will force students to use the pedestrian bridge to cross 58th Street.

LAUSD's responses to Maywood's comments regarding 58th Street do not reference fencing nor do they show that the LAUSD has formulated any other restrictions or design features that will ensure staff and students use the pedestrian bridge to traverse 58th Street. The responses merely assert that, during school hours and after-school activities, students and other pedestrians "would be required to use the bridge to cross 58th Street, and would be prohibited from crossing 58th Street at street level." These conclusory statements, which are unaccompanied by any information or facts explaining how the LAUSD intends to prohibit students and staff from crossing 58th Street at ground level, are insufficient to satisfy CEQA's requirements. (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 628 [216 Cal.Rptr. 502] ["conclusory responses . . . have been held insufficient to satisfy the requirement of a meaningful, reasoned response"]; *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262 [115 Cal.Rptr.3d 631] [EIR must provide sufficient information to enable " 'public [to] discern . . . the "analytic route . . . from evidence to action" [Citation.]' [Citation.]"]; *Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 429 [222 Cal.Rptr. 247] (*Ojai*) [" ' " '[A] conclusory statement "unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind" not only fails to crystallize the issues [citation] but "affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." [Citation.]' " [Citations.]' [Citation.]"].)

The "site plan" that appears in the FEIR also contains no evidence demonstrating that fencing will prohibit students from crossing 58th Street at ground level when traveling between the southern and northern parts of the campus. The plan shows that the south side of 58th Street will include a student dropoff zone located near the entrances to the facilities on the

southern side of the campus. It also shows that the northern side of 58th Street will be lined with fencing that is penetrated by gateways which provide access to the facilities on the northern part of the campus.[13] Therefore, while it is true that the site plan indicates that there will be fencing on the northern side of 58th Street, it also shows that there are access points in the fencing that will allow pedestrians to enter the northern part of the campus at street level.

Although the LAUSD acknowledges that the fencing along 58th Street will contain entryways that provide access to the northern part of the campus, it argues for the first time in its appellate reply brief that these entries are intended to be "emergency" exits that "would remain locked during operating hours." However, LAUSD has cited no portion of the record that supports these factual assertions. On the record before us, there is no evidence that the current design of the school will prohibit students and staff from accessing the northern campus by simply crossing 58th Street at ground level and entering through the gateways in the fencing.

The record also contains no evidence showing that the LAUSD has taken steps to ensure that visitors who attend events at the football stadium would use the pedestrian bridge to traverse 58th Street. According to the FEIR subchapter on parking, varsity football games, which will be played at 7:00 p.m., are expected to be a "peak draw" attracting up to 1,350 visitors and participants. The FEIR indicates that at least 10 percent of these individuals (135 people) are expected to be dropped off at the game. The site plan shows that the pedestrian "drop off zone," which allows cars to drop passengers at the site without blocking traffic, is located directly across the street from gateways along the north side of 58th Street that provide direct entrance to the football stadium. During after-hours stadium events such as evening football games, it is unclear whether attendees who are dropped off at the school can realistically be expected to utilize the pedestrian bridge—which would require them to enter the school facilities on the south side of the campus, go to the second floor gymnasium, cross the pedestrian bridge and then descend to the ground level on the north side of the campus—rather than simply crossing the street. Indeed, based on the information in the record, it is

---

[13] The site plan in the FEIR has a solid line running across the northern side of 58th Street that is penetrated by multiple gateways. Although it is not evident that this solid line depicts fencing, LAUSD's opening appellate brief includes a "blown-up, color version" of the site plan which, according to the LAUSD, shows that the line represents a fence. For the purposes of this appeal, we will assume that we may properly consider this evidence and that the evidence shows that the north side of 58th Street is in fact lined with fencing that is penetrated by gateways.

not even clear that visitors attending such events would have access to the interior areas of the campus that provide access to the pedestrian bridge.[14]

LAUSD argues for the first time in its appellate reply brief that the FEIR adequately addresses these concerns because "persons attending sporting events would be only able to access fields from 57th Street and the parking structure." This statement implies that the gateways to the stadium on the northern side of 58th Street would remain locked during stadium events and, as a result, pedestrians would not be expected to utilize the dropoff zone on the south side of 58th Street. LAUSD, however, has again cited no evidence in the FEIR or the record showing that individuals attending events at the football stadium would be required to enter on 57th Street or through the parking garage. Nor has it cited any evidence that the entryways on the northern side of 58th Street would remain locked during stadium events.[15]

In sum, it is possible that 58th Street and the incorporation of a pedestrian bridge do not raise any significant impacts to pedestrian safety. It is also possible that any hazards that may exist can be easily mitigated with the development of regulations that force pedestrians to use the bridge or with other design features that allow pedestrians to safely cross 58th Street without accessing the pedestrian bridge (such as a crosswalk and signal in the middle of 58th Street). The record, however, does not contain any evidence that the LAUSD considered or otherwise addressed these issues.

C. *Maywood Failed to Establish That the LAUSD Had a Duty to Conduct a Cumulative Impacts Analysis of the I-710 Corridor Project*

LAUSD asserts that the trial court erred in concluding that the FEIR was deficient because it failed to analyze the cumulative impacts of the I-710 corridor project.

1. *Factual Summary*

During public meetings regarding the appropriate scope of the DEIR, community members requested that the LAUSD take into account the effects

---

[14] It is also unclear whether individuals attending stadium events who park on the south side of 58th Street, which is across the street from the gateways to the stadium, would have access to the pedestrian bridge or could be realistically expected to use it.

[15] The site plan in the record does not even indicate that there are entryways to the stadium along 57th Street. The site plan also contains no pedestrian dropoff zones along 57th Street or the parking garage, meaning that vehicles that stop to drop off pedestrians at those locations would block traffic. To the extent the LAUSD is suggesting that vehicles are expected to drive into the parking garage to drop off pedestrians who are attending events at the football stadium, there is no analysis in the FEIR discussing whether the parking garage has been designed to accommodate such traffic.

of the I-710 corridor project, which would allegedly "open up exit-ramps onto Slauson Avenue [and] . . . greatly increase traffic in the area of the school." Although the DEIR analyzed the cumulative impacts of 12 "related" future projects near the school site, it did not discuss the I-710 corridor project.

After the LAUSD released the DEIR, Maywood and its expert submitted written comments reiterating that the LAUSD should consider the cumulative impacts of the "I-710 corridor project[] that includes a new on/off ramp at Slauson [Avenue.]" In support of this assertion, Maywood noted that Caltrans had issued a notice of preparation for the project and held numerous public meetings on the matter.

Although the FEIR did not analyze the cumulative impacts of the I-710 corridor project, it did include responses to Maywood's comments explaining why it had elected not to do so: "The proposed I-710 [c]orridor Project is in the preliminary planning stages. As noted by the comment, the I-710 Project is in the 'scoping' phase. The specific improvements that will be a part of the I-710 project to be considered for approval in Winter 2010 are yet to be determined (such as the Slauson off-ramps). Note that an opening date for the I-710 [c]orridor Project or any portion of the project has not yet been determined but a 'build-out' from the proposed I-710 project is anticipated in 2035. Additionally, full funding for the completion of the project has not been programmed. Further, the technical data associated with the proposed I-710 project (e.g., project vehicle trips, air emissions, etc.) are not publicly available. Therefore inclusion of the proposed I-710 Project in the analysis for South Region High School No. 8 would be extremely speculative."[16]

Maywood's petition for writ of mandate argued that the FEIR was deficient because it failed to "identify and study as a related project the I-710 [c]orridor project of Caltrans, despite its long-standing notice of preparation and regular community meetings on the project." The trial court agreed, concluding that the FEIR should have evaluated potential cumulative impacts from the I-710 project.

---

[16] The LAUSD also stated that "because the proposed I-710 Corridor Project would be constructed after the proposed South Region High School No. 8 Project," Caltrans would be required to "consider potential impacts to this and all other nearby schools. LAUSD will be a reviewing Agency during the CEQA process for the proposed I-710 project and will provide comments regarding the potential impacts to this proposed school site and any other sites under LAUSD's jurisdiction."

2. *The Trial Court Erred in Concluding That the FEIR Was Required to Analyze the Cumulative Impacts of the I-710 Corridor Project*

a. *Summary of CEQA Requirements Regarding Cumulative Impacts*

■ CEQA requires that an EIR contain an evaluation of the cumulative impacts caused by other past, present and reasonably foreseeable probable future projects including those projects outside the control of the agency. (Guidelines, §§ 15130, subd. (a), 15355; Pub. Resources Code, § 21083, subd. (b)(2).) " ' "Cumulative impacts" refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.' [Citation.] 'The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.' [Citation.]" (*Ojai, supra,* 176 Cal.App.3d at p. 428.)

■ The "discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided for the effects attributable to the project alone. . . ." (Guidelines, § 15130, subd. (b).) "[T]he discussion . . . should be guided by the standards of practicality and reasonableness" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 525 [80 Cal.Rptr.3d 28, 187 P.3d 888] (*EPIC*)) and "be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure" (*Ojai, supra,* 176 Cal.App.3d at p. 429).

In assessing the types of projects that should be included in a cumulative impacts analysis, our Supreme Court has clarified that an EIR need not discuss future action "that is merely contemplated or a gleam in a planner's eye." (*Laurel Heights I, supra,* 47 Cal.3d at p. 398.) "[M]ere awareness of proposed expansion plans or other proposed development does not necessarily require the inclusion of those proposed projects in the EIR. Rather, these proposed projects must become 'probable future projects.' [Citation.]" (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1127 [85 Cal.Rptr.3d 50] (*Gray*).) " ' " '[W]here future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as

to future environmental consequences.' [Citation.]" ' [Citation.]" (*EPIC, supra,* 44 Cal.4th at p. 503.)

■ CEQA also requires that an EIR respond to comments pertaining to cumulative impacts. "The level of detail required in a response to a comment depends on factors such as the significance of the issues raised, the level of detail of the proposed project, the level of detail of the comment, and the extent to which the matter is already addressed in the DEIR or responses to other comments." (*Long Beach, supra,* 176 Cal.App.4th at p. 901.) "When a comment raises a significant environmental issue, the lead agency must address the comment 'in detail giving reasons why' the comment was 'not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice.' [Citations.]" (*The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 615 [135 Cal.Rptr.3d 221].)

> b. *Maywood Has Failed to Establish That the Proposed Slauson Avenue Off-ramp Qualifies as a Probable Future Project*

■ CEQA does not require that an EIR consider the potential cumulative impacts of every proposed future project; it requires only that an EIR consider the cumulative impacts of " 'probable future projects.' [Citation.]" (*Gray, supra,* 167 Cal.App.4th at p. 1127.) Thus, to prevail on its claim that the LAUSD had a duty to consider the cumulative impacts of a Slauson Avenue freeway off-ramp that was to be added as part of the I-710 corridor project, Maywood had the burden to prove that the off-ramp qualified as a "probable future project."[17] (See *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 [78 Cal.Rptr.3d 1] ["Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise. [Citations.]"].)

Maywood asserts that the addition of a Slauson Avenue off-ramp is "probable" because Caltrans has issued a notice of preparation for the I-710 corridor project and held public meetings to discuss the scope of the project. Maywood, however, has never provided a copy of the notice of preparation or the transcripts from the scoping meetings. It is therefore impossible for us to determine the current planning stage of the project or whether, as currently proposed, the project will include an off-ramp at Slauson Avenue. The only

---

[17] Maywood has not argued that the LAUSD had a duty to consider the cumulative impact of the I-710 corridor project as a whole; rather, it asserts that the LAUSD had a duty to consider the impacts of one particular element of that project: a proposed off-ramp at Slauson Avenue.

evidence Maywood submitted in regards to the environmental review that has been conducted on the I-710 project or the Slauson Avenue off-ramp consists of a single e-mail from the Los Angeles County Metropolitan Transportation Authority stating: "Metro is working to study alternatives for improvements to I-710 from Ocean Boulevard in the City of Long Beach to [State Route] 60. As part of the I-710 Corridor Project EIR/EIS, a new freeway interchange at Slauson Avenue is being studied."

The allegation that a notice of preparation has been issued for the I-710 corridor project, combined with a single statement that an agency is studying whether to include a Slauson Avenue off-ramp as an element of the project, is not sufficient to demonstrate that the new off-ramp is a "probable future project." (*Gray, supra*, 167 Cal.App.4th at p. 1127 ["proposed development does not necessarily require the inclusion of those proposed projects in the EIR. Rather, these proposed projects must become 'probable future proj-ects.' "].) Based on this evidence alone, we cannot conclude that the inclusion of the Slauson Avenue off-ramp is sufficiently certain to trigger CEQA's cumulative impacts requirements. (*EPIC, supra*, 44 Cal.4th at p. 503 [" ' " '[W]here future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' [Citation.]" ' [Citation.]"].) Nor can we con-clude from this evidence that it would be "reasonable and practical" for LAUSD to attempt to evaluate the cumulative impacts of a Slauson Avenue off-ramp. (*Long Beach, supra*, 176 Cal.App.4th at p. 902 [when "review[ing] the agency's decision to include information in the cumulative impacts analysis[,] . . . [w]e determine whether inclusion was reasonable and practi-cal"].) Because Maywood has failed to provide any evidence showing that a Slauson Avenue off-ramp is a probable future project, we must presume that the LAUSD did not err in concluding that the project was too speculative to warrant cumulative impacts analysis. (*State of California v. Superior Court* (1990) 222 Cal.App.3d 1416, 1420 [272 Cal.Rptr. 472] ["Under CEQA, an EIR is presumed adequate [citation], and the plaintiff in a CEQA action has the burden of proving otherwise."].)

■ Maywood contends that any future project that is undergoing "envi-ronmental review" qualifies as a "probable future project." The case law makes clear, however, that this is true only to the extent that the particular "environmental review" at issue provides evidence that the proposed project is both probable and sufficiently certain to allow for meaningful cumulative impacts analysis.

For example, in *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859 [134 Cal.Rptr.2d 322] (*Eel River*), the court considered whether a water agency was required to analyze the cumulative

impacts of a project that was undergoing an environmental review before the Federal Energy Regulatory Commission (FERC). The water agency prepared a DEIR for a plan to increase the amount of water it intended to withdraw from the Russian River. Petitioners submitted written comments requesting that the water agency consider the cumulative impacts of various proposals pending before FERC that would curtail the amount of water diverted from the Eel River to the Russian River. According to petitioners, these proposals would substantially reduce water flow in the Russian River, which would have cumulative impacts on the water agency's plan to increase the amount of water it intended to withdraw from the Russian River. The water agency rejected the petitioners' request, asserting that although various entities had submitted recommendations to FERC that would modify water flow in the Russian River, the "FERC proceeding is inconclusive and need not be analyzed in the EIR's cumulative impacts section." (*Id.* at p. 869.)

The court, however, concluded that the water agency had a duty to consider the cumulative impacts of the FERC proposals. According to the court, evidence in "[t]he record t[old] a far different story from the one the Agency relate[d in the EIR]. . . ." (*Eel River, supra,* 108 Cal.App.4th at p. 869.) The court explained that, contrary to the agency's assertions, the record showed that the proposals before FERC would not merely "modify" water flow in the Russian River. Rather, the evidence showed that "every" alternative proposal submitted to FERC—including one submitted by the water agency itself—would decrease the amount of water diverted from the Eel River to the Russian River. The record also showed that the water agency's own proposal to FERC contained a detailed analysis demonstrating how various water flow reductions would affect the Russian River. The court concluded that because every proposal before FERC would reduce the amount of water diverted from the Eel River to the Russian River, and because there was evidence analyzing how these reductions would impact the Russian River, the "curtailment of Eel River diversions [qualified as a] . . . reasonably foreseeable future project" and that "it was both reasonable and practical to include the Eel River curtailment proposals . . . in the [water a]gency's cumulative impacts analysis." (*Id.* at p. 870; see *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 74 [198 Cal.Rptr. 634] [developer's project proposal submitted to city planning commission for environmental review was sufficiently definite to require cumulative impacts analysis where evidence showed "there was no practical or reasonable barrier to their disclosure and inclusion in the analyses"].)

Unlike the petitioners in *Eel River,* Maywood has provided no evidence that the preliminary environmental review that has been conducted on the I-710 corridor project (which consists of a notice of preparation) indicates that a Slauson Avenue off-ramp is likely to be included as an element of the

project. Nor has it provided any evidence that this environmental review demonstrates that it would be reasonable and practical for the LAUSD to attempt to analyze the effects of the off-ramp. Without any such evidence, we cannot conclude that the LAUSD's decision not to conduct a cumulative impacts analysis violated CEQA.

■ Maywood also argues that the LAUSD's responses to comments regarding the I-710 corridor project and the Slauson Avenue off-ramp were insufficient. We disagree. "The level of detail required in a response to a comment depends," in part, on "the level of detail of the comment." (*Long Beach, supra,* 176 Cal.App.4th at p. 901.) "Where a general comment is made, a general response is sufficient." (*Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 862 [226 Cal.Rptr. 575].) Maywood's comments regarding the I-710 corridor project were very general in nature. Maywood asserted only that a NOP had been issued for the I-710 corridor project, which was likely to include a new off-ramp at Slauson Avenue that would greatly affect traffic flow. As discussed above, Maywood did not provide a copy of the NOP, it did not cite any specific evidence showing that a Slauson Avenue off-ramp was likely to be included as an element of the project and it did not provide evidence showing that the off-ramp would affect traffic flow in the project area.

In response to these general comments, LAUSD explained that the project was too speculative to qualify as a probable future project because (1) the responsible agency had not yet determined what specific improvements would be included in the I-710 corridor project (including whether the project would include a Slauson Avenue exit); (2) the responsible agency had not provided any information regarding when the project would be completed; (3) there was no technical data available that would permit meaningful analysis of the impacts of the project; and (4) the program had not yet been funded.

Given the general nature of Maywood's comments, LAUSD's responses were sufficient. CEQA requires only that the agency provide a reasoned analysis, supported by factual information, explaining why a comment was not accepted. (*Flanders Foundation v. City of Carmel-by-the-Sea, supra,* 202 Cal.App.4th at p. 615.) The LAUSD satisfied these requirements by listing the specific facts it relied on in concluding that the Slauson Avenue off-ramp was too speculative to qualify as probable future project. This factual information—which has not been contested by Maywood—allowed the "public to discern . . . 'the analytic route the . . . agency traveled from evidence to action.' " (*Long Beach, supra,* 176 Cal.App.4th at p. 902.)

D. *The FEIR Contains an Adequate Discussion of Impacts from Hazardous Materials*

The LAUSD argues that the trial court erred in concluding that the FEIR did not adequately assess potential environmental impacts from hazardous materials.

1. *Factual Summary*

a. *The NOP's, the DEIR's and the FEIR's Discussions of Impacts from Hazardous Materials*

i. *The NOP's Discussion of Hazardous Materials*

The NOP studied numerous categories of potential environmental impacts from hazards and hazardous materials and concluded that the project would have less than significant impacts in each such category. In regard to potential hazards caused by "upset conditions" during the construction process, the NOP explained that the LAUSD was required to test the site for asbestos and lead-based paint contamination and comply with "existing regulations for the treatment/removal of [asbestos and lead-based paint]." The NOP also considered whether the project was located on a site included on a list of hazardous materials sites compiled by the DTSC pursuant to Government Code section 65962.5. The NOP noted that the LAUSD had conducted an ESA and identified four facilities listed on the DTSC list. These sites had a "history of automotive service and repair operations" that had "used hazardous materials and . . . generated hazardous wastes."

The NOP further stated that because hazardous facilities were located on the project site, the LAUSD would be required to "conduct an investigation and cleanup in compliance with DTSCs cleanup process for contaminated sites." Moreover, according to the NOP, construction could not occur until DTSC provided a "no further action" finding on the project site. The NOP concluded that because the LAUSD would have to comply with these requirements before constructing the school, the project would have "less than significant [impacts]" and that no further study of this issue was required for the FEIR.

During the public comment period, Maywood and members of the community questioned the extent to which the LAUSD had investigated the environmental conditions at the project site and requested that the DEIR include a more detailed discussion of the issue. More specifically, the public expressed "concern regarding a potential release of hazardous materials at the site

before or during construction of the school and potential impacts from migration of off-site hazardous . . . materials to site occupants if the school is built."

## ii. *The DEIR's Discussion of Hazardous Materials*

The DEIR subchapter on "Hazards/Hazardous Materials" stated that although the NOP determined the project "would have no impact or a less-than-significant impact for all environmental . . . topics [related to] Hazards and Hazardous materials," the LAUSD had elected to include "a more detailed discussion of the potential impacts associated with those topics."

The DEIR explained that, under the Education Code, the DTSC was responsible for overseeing the environmental review and cleanup of a proposed school site, which involved a three-step process: "After a site is selected, the first step requires the school district to contract with qualified environmental consultants to prepare a [Phase I ESA[18]]. The school district submits this assessment to DTSC for review, comment and approval. If the ESA for the project reveals potential contamination, a [PEA[19]] is required. The PEA includes environmental sampling [and] a health risk assessment that complies with DTSC guidelines. . . . If the assessment identifies no significant health or environmental risks the school district will receive a No Further Action (NFA) determination letter from DTSC and the process is complete. [¶] If the PEA identifies significant contamination, school districts

---

[18] Under the version of the Education Code then in effect, a "Phase I environmental assessment" was defined as "a preliminary assessment of a property to determine whether there has been or may have been a release of a hazardous material, or whether a naturally occurring hazardous material is present, based on reasonably available information about the property and the area in its vicinity. A phase I environmental assessment may include, but is not limited to, a review of public and private records of current and historical land uses, prior releases of a hazardous material, data base searches, review of relevant files of federal, state, and local agencies, visual and other surveys of the property, review of historical aerial photographs of the property and the area in its vicinity, interviews with current and previous owners and operators, and review of regulatory correspondence and environmental reports. Sampling or testing is not required as part of the phase I environmental assessment. . . ." (Ed. Code, former § 17210, subd. (g) [amended by Stats. 2012, ch. 39, §1].)

[19] " 'Preliminary endangerment assessment' means an activity that is performed to determine whether current or past hazardous material management practices or waste management practices have resulted in a release or threatened release of hazardous materials, or whether naturally occurring hazardous materials are present, which pose a threat to children's health, children's learning abilities, public health or the environment. A preliminary endangerment assessment requires sampling and analysis of a site, a preliminary determination of the type and extent of hazardous material contamination of the site, and a preliminary evaluation of the risks that the hazardous material contamination of a site may pose to children's health, public health, or the environment, and shall be conducted in a manner that complies with the guidelines published by the Department of Toxic Substances Control entitled 'Preliminary Endangerment Assessment: Guidance Manual . . .' . . . ." (Ed. Code, § 17210, subd. (h).)

may elect to drop the proposed school site from consideration or cleanup the contamination under a DTSC Voluntary Cleanup Agreement or School Cleanup Agreement. DTSC follows Health and Safety Code requirements for all response actions, and approval of a Remedial Action Plan is granted after a public comment period. When all necessary cleanup activities are complete to ensure public health and safety, DTSC will certify that no further action is required, and school development can proceed."[20] The DEIR also summarized numerous additional state and federal laws and regulations governing the handling and transportation of hazardous materials and asbestos and lead-based paint abatement.

The DEIR explained that, pursuant to the Education Code siting requirements summarized above, the LAUSD had already conducted an ESA, a PEA, a health risk assessment and a rail safety study. Based on the results of the ESA, the LAUSD conducted a PEA that included a soil analysis of the project site. According to the DEIR, the PEA analyzed hundreds of soil samples taken from all nine commercial parcels and 11 of the residential parcels located on the site. The DEIR noted that the LAUSD had been unable to secure "access agreements" for 27 of the residential parcels and, as a result, no testing had occurred on those particular parcels. The DEIR indicated that the DTSC approved the PEA, but ordered the LAUSD to conduct a supplemental site assessment that would include testing at each parcel not tested during the initial PEA.

The results of the PEA showed that the project site had an estimated cumulative cancer risk "exceed[ing] the DTSC target risk-screening goal." The DEIR explained that, as a result of these findings, the LAUSD had a statutory duty to complete further steps "in investigating, assessing and remediating the project's sites environmental conditions." First, the LAUSD would be required to prepare a supplemental site investigation (SSI) and a "removal action work plan (RAW)" that would govern the remediation or removal of any contaminated soil. The SSI and removal action work plan (RAW) would both require the approval of the DTSC. Second, the LAUSD would have to "perform the removal action . . . consistent with the DTSC's cleanup standards and other performance criteria under [the DTSC's] oversight." Third, prior to construction, the LAUSD would have to obtain "the DTSC's review and approval . . . [that] the site's condition will not significantly threaten the health and safety of workers, students, and adults."

The DEIR concluded that "with the implementation of the required response actions as approved by DTSC, such as conducting additional investigation and completing the RAW under the DTSC oversight, the proposed

---

[20] The Education Code requirements summarized in the DEIR appear in sections 17213.1 and 17213.2.

project would have a less than significant hazardous materials impact to the public and the environment."

### iii. *FEIR's Discussion of Hazardous Materials*

Following the release of the DEIR, Maywood submitted comments questioning the sufficiency of the hazardous materials investigation LAUSD had conducted prior to the DEIR. Maywood noted that "[e]ven now, LAUSD has tested the soils conditions at only roughly half the lots [in the project site], and almost none of the residential properties. . . ." Maywood also complained that the DEIR did not adequately consider "environmental impacts associated with the corrective action itself," explaining that there was no discussion of how the site would be cleaned and whether such cleaning would have any effect on the environment.

The FEIR did not include any substantive changes to the DEIR's discussion of environmental impacts from hazardous materials. The FEIR did, however, include detailed responses to Maywood's comments about the inadequacy of the hazardous materials investigation. These responses asserted that Maywood's comments "incorrectly suggest[] the project's EIR cannot be certified until certain information or measures to mitigate the site's environmental conditions are first disclosed, or that the District cannot undertake the CEQA process for this project in parallel with the DTSC Site Assessment process as the District has done with many other new school projects."

The LAUSD's response summarized all of the steps it had taken—and all of the future steps it would be required to take—prior to initiating construction. The LAUSD reiterated that it had conducted an ESA, submitted and obtained DTSC approval of a PEA and was currently in the process of conducting an SSI "to further refine the nature and extent of contamination," which would enable it to prepare a RAW. Once the SSI was completed, the LAUSD would prepare a remediation work plan and "implement it, including all required remedial steps, under the DTSC's oversight, until it receives DTSC's 'no further action' determination." This " 'no further action' determination would confirm the elimination of any risk to the health and safety of students, faculty, employees and other persons; it would occur before either construction could begin or buildings could be occupied."

The LAUSD's responses further explained that "the District has already committed itself to adopting such measures which will meet the specific criteria governing the investigation, assessment, and remediation of the project's site environmental conditions through . . . the terms of the Initial Study and Draft EIR for this project, and the terms of the Master Oversight Agreement it has entered into with DTSC, which has the regulatory authority

to supervise and approve the District's investigation, assessment, and remediation of the project site." According to the LAUSD, under CEQA, it was permitted to "commit itself to craft mitigation measures that would satisfy enforceable performance criteria by the time of project approval (i.e., DTSC's criteria). CEQA also imposes a responsibility upon the DTSC to undertake a distinct CEQA review for the activities related to the removal action. This review can be completed as part of the RAW process."

The FEIR also noted that it would be "impractical and infeasible to complete" the SSI, the RAW and the remediation "before the EIR is prepared and certified and the project is approved. For example, [LAUSD] cannot in some cases complete a site assessment, which could involve such invasive testing as digging into paved surfaces, or cannot begin to remediate a project site, such as removal of any impacted soil . . . until the District obtains an order of possession in an eminent domain action to acquire the project parcels. The District may not, however, secure any such right of entry until it first certifies the project's EIR, approves the project, adopts a resolution of necessity authorizing the project's sites acquisition through condemnation, and commences an eminent domain proceeding. [¶] In circumstances such as these where practical considerations preclude devising specific measures to mitigate at the planning stage, CEQA allows a Lead Agency such as the District, to commit itself to devise measures that will satisfy performance criteria at the time of project approval. . . . That is what the District has committed to do here. . . ."

### b. *Evidence in the Administrative Record*

The administrative record contains copies of the phase I ESA, the PEA and the health risk studies that were referenced in the DEIR and the FEIR. The ESA states that it was conducted to "identify historical and/or current activities that resulted in, or potentially could result in, environmental impairment to the Site through the release of hazardous substances (including petroleum compounds) to soil or groundwater. These are referred to as recognized environmental conditions [REC's]."

The entity that prepared the ESA reviewed numerous different environmental databases, property records and historical documents to gather information on each parcel in the project site.[21] It also conducted a "site reconnaissance . . . to evaluate the current conditions of the Site," which included assessment of, among other things, (1) the "current uses and occupants" of each parcel within the project site, and (2) evidence of "stains/spillage/distressed vegetation," "potential sensitive ecological receptors," "storage tanks" or "potential PCB containing materials."

---

[21] The ESA lists over 30 environmental databases and 10 additional categories of environmental records and historical resources that were reviewed.

The ESA identified four commercial parcels that qualified as a "recognized environmental condition," which included three automobile repair sites and the site of a former carpet and rug cleaner. According to the ESA, each of these sites presented a "potential for impacts to the subsurface." The ESA also recommended that, due to the age of many other structures on the project site, LAUSD should conduct soil testing for lead and pesticide contamination. It also noted that many of the buildings may "contain asbestos-containing materials." Based on these findings, the ESA recommended that LAUSD conduct a "preliminary endangerment assessment" to "investigate the identified RECs and to assess whether the subsurface conditions have been impacted."

The administrative record also contains a copy of the PEA, which was prepared by AECOM Technical Services and was intended: "(1) to determine through a field sampling and analysis program whether historical uses of the Site and within the immediate vicinity have resulted in the presence of hazardous substances in soil and soil gas, (2) to establish the amount, concentrations and extent of hazardous substances or petroleum products that may be present in soil . . . and soil gas beneath the Site as a result of historical or current practices, and the chemicals of potential concern (COPCs), and (3) to estimate potential risk to public health and the environmental posed by the COPCs detected in the subsurface by conducting a human health screening evaluation . . . based on a residential land-use scenarios, and an environmental risk assessment."

The PEA noted that "access was not obtained for twenty seven (27) of the forty-seven (47) parcels at the site. Twenty parcels (20) (nineteen (19) properties) were assessed including all . . . commercial parcels . . . . The remaining properties to be assessed consist of twenty seven (27) residential parcels, requiring shallow soil samples . . . to be collected for lead based paint . . . and . . . pesticides . . . analyses . . . ." The "scope of work" conducted for the PEA included taking samples of soil and soil-gas to determine the presence and concentration levels of numerous types of volatile organic compounds, petroleum products, lead-based paint and pesticides. Groundwater samples were also taken.

The study revealed that over half of the tested parcels included lead and pesticide detections that exceeded "DTSC screening criteria." Numerous other chemicals were found on the project site, which were concentrated around the commercial parcels. Overall, the PEA concluded that the project site as a whole had an "estimated cumulative cancer risks [that] exceed[s] the DTSC target risk-screening goal . . . ."

As a result of these findings, the PEA recommended "further action to define the extent of impacted soil and soil gas, assess groundwater beneath the Site and to assess properties once access is granted." The additional scope of work would include "[l]ead and [pesticide] sampling at the remaining residential properties"; "[d]evelopment of a Groundwater Technical Memorandum to investigate potential impact of COPCs in the perched water-bearing zone beneath the site"; and "[a]dditional soil gas investigation on the southwestern side of the property." According to the PEA, "[t]he additional investigation and subsequent preparation of the removal action workplan (RAW) that outlines what is needed to be preformed to mitigate the identified Site impacts will take longer than six months to complete." (Boldface omitted.)

In a letter dated October 27, 2009, DTSC approved the PEA conducted on the project site. DTSC explained that, "[b]ased on assurances in the PEA that the District will be conducting the addition[al] sampling required, DTSC hereby approves the PEA Report. The response action should include a Supplemental Site Investigation to determine the nature and extent of contamination that may be followed by a removal or remedial action. DTSC estimates the preparation and implementation of the required response action will take six months or more to complete. [¶] Pursuant to Education Code section 17213.2, subdivision (a), if the District elects to pursue site acquisition or construction, the District shall enter into an agreement with DTSC to oversee response actions at the Site. . . ."

Before the LAUSD approved the FEIR, the LAUSD's chief facilities executive submitted a memorandum that included a summary of the hazardous materials investigation of the project site. The memorandum indicated that the LAUSD would be required to prepare a remediation action plan "to address soil gas and impacted soil" and stated that the "preliminary . . . order of magnitude of costs for the remediation are estimated between $2 million–$4.4 million, which includes an average for the 26 residential properties that have not been assessed due to lack of access."

 c. *Trial Court's Rulings on the FEIR's Investigation of Hazardous Materials*

In the trial court, Maywood did not argue that the FEIR's analysis of the environmental impacts from hazards and hazardous materials was insufficient under CEQA. Instead, it argued only that the LAUSD had violated Education Code sections 17213 and 17213.1 by approving the FEIR without investigating every parcel of property on the project site or completing a remediation plan that included the "actual budgeted costs" of the cleanup.

The trial court agreed, ruling that the LAUSD's hazardous materials investigation violated the Education Code. However, the trial court also ruled that the FEIR's hazardous materials analysis violated CEQA because it "fail[ed] to quantify the degree and scope of the contamination at the proposed building site." In support, the court noted that the LAUSD had not conducted water or soil testing on 27 of the residential parcels located on the site and did not assess "the Environmental Impacts of Disturbing Contaminated Groundwater and Soils During Construction." According to the court, the record contained no evidence demonstrating that "contaminated soils and groundwater can be mitigated to a point where it is not a substantial impact. . . ."

### 2. *LAUSD Conducted an Adequate Investigation of Hazardous Materials*

The LAUSD argues that its hazardous materials investigation, coupled with its commitment to conduct an SSI and fully remediate the site under the supervision of DTSC, is sufficient to discharge its duties under CEQA. Maywood, on the other hand, argues that the trial court properly concluded that the FEIR did not adequately assess potential impacts from hazardous materials because (1) LAUSD has not sampled 27 parcels of residential property located in the project site, and (2) LAUSD has not disclosed or completed a soil and groundwater remediation plan. Maywood asserts that LAUSD's agreement to complete a further investigation and cleanup of the project site constitutes improper deferral of mitigation.

■■ Under CEQA, it is generally " 'improper to defer the formulation of mitigation measures until after project approval; instead, the determination of whether a project will have significant environmental impacts, and the formulation of measures to mitigate those impacts, must occur *before* the project is approved.' [Citation.] However, 'when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts, the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project. Moreover, . . . the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study.' [Citation.]" (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906 [124 Cal.Rptr.3d 755] (*Oakland Heritage*).) "[A] condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance." (*Ibid.*)

The First District recently applied these principles in *Oakland Heritage, supra*, 195 Cal.App.4th 884, which presented an analogous set of facts. The

real party in interest, a developer, prepared an EIR for a mixed-use development that contained a chapter analyzing potential impacts from "seismicity." (*Id.* at p. 888.) The EIR revealed that the project site was located near two active fault lines that presented potentially significant seismic hazards, including "the potential for strong ground shaking." (*Ibid.*) The EIR concluded that, " '[i]n the event of a major earthquake in the region, seismic ground shaking could potentially injure people and cause collapse or structural damage to proposed structures.' " (*Id.* at p. 889.) These impacts were categorized as " '[p]otentially [s]ignificant.' " (*Ibid.*)

The EIR explained that, as part of its investigation of seismic impacts, the developer had conducted a "preliminary or ' "Master Plan" ' geotechnical investigation to determine overall engineering feasibility and to inform the preliminary designs." (*Oakland Heritage, supra,* 195 Cal.App.4th at p. 892.) According to the EIR, this master plan provided the "geotechnical engineers [with] '. . . a broad understanding of the site conditions while delimiting areas on the site that are especially favorable for development or could be problematic from a soils engineering perspective.' " (*Ibid.*)

The EIR also explained that "[b]ased on [the] master plan-level geotechnical investigation," the developer would prepare " '[a] site-specific, design level geotechnical investigation for each site area . . . . [which would] determine final design parameters for the walls, foundations, foundation slabs, and surrounding related improvements.' " (*Oakland Heritage, supra,* 195 Cal.App.4th at p. 889.) The EIR stated that the level of investigation necessary to prepare the master plan was "not sufficient to generate the ' "design-level" ' data needed to make final grading or structural designs" and that "it was not effective to conduct a design-level investigation [prior to certifying the EIR] because the project could change considerably during environmental review. However, according to the . . . EIR, [the] preliminary geotechnical study in most cases provides enough detail to evaluate whether geologic or seismic impacts exist and whether mitigation would be necessary." (*Id.* at p. 892.)

The EIR required that "before the issuance of a building permit for any portion of the project site," the developer would submit a design level investigation "for each parcel" (*Oakland Heritage, supra,* 195 Cal.App.4th at p. 892) that would "be in accordance with applicable City ordinances and policies and consistent with the most recent version of the California Building Code, which requires structural design that can accommodate ground accelerations expected from known active faults." (*Id.* at p. 889.) In addition, the EIR required that the design level investigation would be reviewed by a project structural engineer, a registered geotechnical engineer and submitted to "the City Building Services Division . . . 'to ensure

compliance with the applicable geotechnical investigation and other applicable Code requirements.' " (*Id.* at p. 893.) The EIR also contained "an extensive discussion of the mandates of various state and City laws bearing upon seismic safety, including the Seismic Hazards Mapping Act [citation], the Building Code . . . , and various City ordinances." (*Id.* at p. 892.)

The EIR concluded that " '[c]onsidering the rigorous investigation process required under the engineering standard of care, compliance with state laws and local ordinances, and regulatory agency technical reviews, the mitigation measures . . . will reduce the risk of seismic hazards and ensure that impacts associated with development [of the] . . . Project area would remain less than significant.' " (*Oakland Heritage, supra,* 195 Cal.App.4th at p. 910.)

After the City of Oakland certified the EIR, the Oakland Heritage Foundation filed a petition for writ of mandate arguing, in part, that the EIR had "improperly deferred mitigation of the seismic effects of the project [by] . . . leav[ing] to the future the formulation of mitigation measures for seismic impacts, and fail[ing] to set objective performance standards for such mitigation." (*Oakland Heritage, supra,* 195 Cal.App.4th at p. 906.)

■■ The appellate court summarized the legal framework applicable to the mitigation of potentially significant environmental impacts, explaining: " ' "[F]or [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process . . . , the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. [Citations.]" ' [Citation.] [¶] Furthermore, a condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance." (*Oakland Heritage, supra,* 195 Cal.App.4th at p. 906.)

The appellate court concluded that, under those standards, the EIR sufficiently addressed potential environmental impacts associated with seismicity. The court noted that the EIR "discussed the statutes and regulations aimed at increasing seismic safety." (*Oakland Heritage, supra,* 195 Cal.App.4th at p. 907) and "discussed the responsibilities of the engineers and building officials and the processes to ensure that site investigations, grading, and construction are completed in accordance with the laws designed to protect the public and property from the effects of earthquake shaking and ground failure." (*Id.* at pp. 908–909.) The court further noted that the "preparers of the EIR" had relied on an initial "Geotechnical Investigation" and committed

themselves to conduct a more thorough "site-specific investigation" that would be used to formulate the final structural designs. (*Id.* at pp. 909–910.)

■ The court held that the "mitigation measures . . . f[e]ll squarely within the rule . . . that 'when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts,' and has committed to mitigating those impacts, the agency may defer precisely how mitigation will be achieved under the identified measures pending further study." (*Oakland Heritage, supra*, 195 Cal.App.4th at p. 910.)

There are several similarities between this case and *Oakland Heritage*. As in *Oakland Heritage*, the FEIR explained that the LAUSD conducted an extensive preliminary investigation of the project site to determine whether the site exhibited contamination from hazardous materials. Based on this investigation, the LAUSD concluded that additional investigation and remediation would be necessary. As in *Oakland Heritage*, these further investigatory steps were subject to numerous environmental rules and regulations described in the EIR and would be overseen by another governmental agency—the DTSC. Finally, construction would not start until DTSC determined that no further action was necessary.

Like the EIR at issue in *Oakland Heritage*, the FEIR in this case also included a discussion explaining why it would be impractical to conduct a full investigation and remediation of the project site prior to the approval of the FEIR. Specifically, the FEIR and the PEA indicated that the LAUSD had been unable to procure access agreements for 27 of the residential properties at the project site and therefore would have to secure a judicial right of entry before conducting testing on those parcels. (See generally Code Civ. Proc., §§ 1245.010–1245.030.)[22]

Finally, the administrative record contains evidence assessing the feasibility of the cleanup. The DTSC letter approving the PEA indicated that cleanup would take more than six months and the LAUSD estimated that the costs of remediation were estimated to be "between $2 million–$4.4 million."

---

[22] Maywood argues for the first time on appeal that the LAUSD could have easily obtained entry to the 27 residential properties under Education Code section 17213.1, subdivision (a)(4)(B), which states: "Upon request from the school district, the Director of the [DTSC] shall exercise its authority to designate a person to enter the site and inspect and obtain samples . . . , if the director determines that the exercise of that authority will assist in expeditiously completing the preliminary endangerment assessment." However, this argument was never raised in the trial court proceedings and has therefore been forfeited. In any event, the statute Maywood cites permits entry if the DTSC determines that it would "assist in expeditiously completing the [PEA]." Here, the record demonstrates that the LAUSD successfully completed the PEA, which was approved by the DTSC, without needing to access the 27 residential parcels at issue.

For the same reasons as stated in Oakland Heritage, the actions LAUSD took in this case were sufficient to discharge its duties under CEQA.[23]

### E. *The FEIR Adequately Analyzes a Reasonable Range of Alternatives*

LAUSD argues that the trial court erred in concluding that the FEIR did not provide a "[m]eaningful [a]nalysis of [a]lternatives to the [p]roposed Maywood [s]ite."

#### 1. *Summary of Applicable Law*

The Guidelines require that an EIR "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decision-making and public participation. An EIR is not required to consider alternatives which are infeasible." (Guidelines, § 15126.6, subd. (a).)

The Guidelines define the term "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.) "Among the factors that may be taken into account when addressing the feasibility of alternatives are site suitability, economic viability, availability of infrastructure, general plan consistency, other plans or regulatory limitations, jurisdictional boundaries . . . and whether the proponent can reasonably acquire, control or otherwise have access to the alternative site . . . ." (Guidelines, § 15126.6, subd. (f)(1).)

"The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives." (Guidelines, § 15126.6, subd. (a).) The Guidelines provide that "[t]he EIR shall include sufficient information about each alternative to allow meaningful evaluation, analysis and comparison with the proposed project." (Guidelines, § 15126.6, subd. (d).)

---

[23] LAUSD has requested that we take judicial notice of the "Preliminary Endangerment Assessment Guidance Manual" issued by the DTSC. Since we find it unnecessary to resort to this document for our analysis, we deny the request for judicial notice. (See *Portico Management Group, LLC v. Harrison* (2011) 202 Cal.App.4th 464, 474, fn. 6 [136 Cal.Rptr.3d 151].)

"There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Guidelines, § 15126.6, subd. (a).) "The agency's discretion to choose alternatives for study will be upheld as long as there is a reasonable basis for the choices it has made." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2012) Project Alternatives, § 15:11, p. 743 (rev. 3/12).) "The selection will be upheld, unless the challenger demonstrates 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 988 [99 Cal.Rptr.3d 572] (*California Native Plant Society*).)

## 2. *Summary of LAUSD's Consideration of Alternative Sites*

The DEIR contained a 43-page chapter describing six possible alternatives to the project which included a "No Project/No Build" alternative, a "Reduced Project" alternative and four alternatives that utilized different project sites. The DEIR also included a list of approximately 50 additional sites that were considered during the review process, but were ultimately deemed to be improper for inclusion in the DEIR.

The "Reduced Project" alternative consisted of a high school located on the same project site "that would require 25 percent less land and would have 25 percent less capacity than the Proposed Project." The DEIR explained that the reduced project alternative would have less significant impacts in numerous different environmental categories, including aesthetics, air quality, noise, pedestrian safety and population and housing. The DEIR further stated that the alternative would meet the project objective of alleviating overcrowded conditions at Bell High School, "but not to the extent as with the Proposed Project."

The four alternative project sites discussed in the DEIR included "Site No. 26," which was located in the City of Vernon. Site No. 26 was approximately the same size as the proposed project site and would consist of the same facilities. The LAUSD concluded that because Site No. 26 was located in a commercial area, it would have less significant impacts on aesthetics, air quality, population and housing and noise. The DEIR further concluded, however, that the site would have greater impacts on pedestrian safety due to "the proximity to the railroad tracks and to a high volume of truck traffic." It would also have greater impacts from hazardous materials "due to its prior use as an industrial property."

Maywood submitted numerous comments regarding the DEIR's discussion of alternatives. First, it argued that LAUSD should consider "Reduced Project"

alternatives that reduced the overall size of the project while maintaining the same number of classrooms. According to Maywood, LAUSD's reduced project alternative was a " 'straw man' " that was designed to fail "by unnecessarily eliminating classroom space." Maywood proposed three alternative reduced-project options that allegedly "fix[ed] th[e] 'straw man' problem by only eliminating . . . non-classroom facilities from the design." Each of these alternatives either added classrooms on to existing high schools located near the project site or reduced the size of the project by removing only "non-classroom facilities."

Second, Maywood complained that the FEIR did not consider an alternative site that LAUSD owned in Bell, California. Maywood acknowledged that the LAUSD intended to use this site for an adult education center, but contended that "LAUSD's own land should go first to general education facilities, which take priority over adult education . . . ."

Third, Maywood's engineering expert submitted comments arguing that the DEIR should provide "[f]urther consideration of rejected Alternative Site No. 26 for the proposed school." According to the letter, Site No. 26 would present lesser impacts in terms of parking, traffic and pedestrian safety.

Although the FEIR adopted the discussion of alternatives that appeared in the DEIR, it included detailed responses to Maywood's comments regarding the LAUSD's selection of alternatives. First, in response to Maywood's assertion that the LAUSD should consider a "reduced project" alternative that retained the same number of classrooms, the LAUSD explained that any such configuration would violate CDE high school siting policies that imposed a maximum student per acre density of 150 students. The FEIR also included responses that addressed each specific "Reduced Project" alternative set forth in Maywood's comments.

Second, the responses explained why the LAUSD had rejected Site No. 26: "This site was not chosen due to proximity to trucking and industrial facilities. There is a high volume of large truck traffic. This alternative would achieve all of the project objectives, but would have greater impacts associated with pedestrian safety, land use, and hazards and hazardous materials. On January 5, 2009, the California Department of Education (CDE) issued a Site Evaluation Report that recommended that LAUSD no longer pursue acquiring this site."

Third, the responses explained that Maywood's proposal to utilize the site that LAUSD owned in Bell, California, was not feasible because the board of education had already approved that site for an adult technology and education center.

### 3. *The FEIR Contains an Adequate Discussion of Project Alternatives*

The trial court identified two problems with LAUSD's alternatives analysis. First, the court found that the FEIR failed to consider any "Reduced Project" alternative that retained the same number of classrooms while reducing the overall size of the project. Second, the court concluded that the FEIR did not contain a sufficient discussion of Alternative Site No. 26. We disagree with both conclusions.

#### a. *The FEIR Provided a Reasonable Basis for Electing Not to Include a Reduced Project Alternative That Maintained the Same Number of Classrooms*

The trial court ruled that the LAUSD's decision to select a reduced project alternative that lowered the overall number of classrooms by 25 percent was unreasonable and therefore "fatal to the legal sufficiency of the EIR." The court explained that although LAUSD's "Reduced Project" alternative would not meet the project objective of alleviating overcrowding at Bell High School to the same degree as the proposed project, the LAUSD could have selected a reduced project alternative that retained the same number of classrooms while eliminating additional nonclassroom facilities. According to the court, "[t]here was absolutely no reason—other than to ensure its rejection—for the 'reduced project' alternative to reduce the number of classrooms to be built."

Generally, an agency's selections of alternatives will be upheld as long as there is a reasonable basis for the choices it has made. In this case, the responses in the FEIR explained that the LAUSD had not considered any reduced project alternative that maintained the same number of classrooms because such a configuration would violate CDE's high school siting requirements imposing a maximum student per acre density of 150 students.[24]

The record demonstrates that, prior to drafting the DEIR, the LAUSD discussed the possibility of reducing the overall size of the project site and concluded that any such reduction would have to comply with the CDE's maximum density requirements. (See *Citizens of Goleta Valley v. Board of*

---

[24] Maywood argues that, in assessing the adequacy of the LAUSD's alternatives, we should not consider any argument relying on these density requirements because the LAUSD did not cite these materials in the trial court. Even assuming that LAUSD's failure to cite to the density requirement in its trial court brief would qualify as a forfeiture, we retain discretion to address the issue. (See *In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 290 [123 Cal.Rptr.3d 260] ["An appellate court, however, has the discretion to consider for the first time on appeal an issue of law based on undisputed facts."].) Moreover, the trial court's written order specifically considered the density requirements in assessing the range of alternatives selected by the LAUSD.

*Supervisors* (1990) 52 Cal.3d 553, 569 [276 Cal.Rptr. 410, 801 P.2d 1161] [" 'a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [EIR]' "].) On April 28, 2009, the LAUSD chief facilities executive provided the board of education and the superintendent a memorandum discussing "potential alternative site configurations" that could reduce the "number of acres, residential displacements and relocation required for [the new high school]." The memorandum noted that "any possible alternative configurations would have to comply with California Department of Education's (CDE) minimum standards related to school site sizes in order to receive state matching funds."

The memorandum explained that these standards included maximum density requirements: "[t]he California Department of Education [has] set forth guidelines for site selection in the 'Guide to School Site Analysis and Development, 2000 Edition.' However, in recognition of site selection constraints resulting from dense urban development and other issues, CDE developed the Small School Site Policy in 2001. Under this policy, the focus is on acreage and student density. For sites that are less than 50 percent of the CDE full recommended acreage, additional factors such as multi-story construction and underground parking are considered when evaluating student density. The Small Schools Policy requires that student density for high schools not exceed 150 students per acre with adjustments for the virtual acreage created by multi-story construction and underground parking."

The analysis in LAUSD's memorandum is predicated on various regulations and publications issued by the CDE. California Code of Regulations, title 5, section 14010, subdivision (a) requires that "[t]he net usable acreage and enrollment for a new school site shall be consistent with the numbers of acres and enrollment established in the 2000 Edition, 'School Site Analysis and Development' published by the California Department of Education . . . ." (Cal. Code Regs., tit. 5, § 14010, subd. (a).) Section 14010, subdivision (u), permits the State Superintendent of Public Instruction to "grant exemptions to . . . the standards in this section if the district can demonstrate that mitigation of specific circumstances overrides a standard without compromising a safe and supportive school environment." (Cal. Code Regs., tit. 5, § 14010, subd. (u).) The CDE developed the "Small School Site Guidelines" to "establish[] guidelines for districts to use in meeting the [acreage requirement] exemption criteria" referenced in section 14010, subdivision (u).[25] These guidelines state that an education agency "requesting approval for

[25] We take judicial notice of the Small School Site Guidelines <http://www.cde.ca.gov/ls/fa/sf/smallschoolsite.asp> (as of July 18, 2012). (See Evid. Code, § 452, subd. (c); *Board of Education v. Watson* (1966) 63 Cal.2d 829, 836, fn. 3 [48 Cal.Rptr. 481, 409 P.2d 481] [appropriate to take judicial notice of data "not cited by the parties" that are "contained in a publication issued by [the CDE]"].)

small sites must . . . agree to comply with specific Small School Site Policy provisions . . . detailed in this policy . . . [which] include[s] compliance with maximum density standards." The Small School Site Guidelines further state that "maximum number of students per acre" at a single track high school is 150 students.

The memorandum and authorities summarized above demonstrate that there was a reasonable basis for LAUSD's decision not to include an alternative that reduced the size of the project by 25 percent without removing any classrooms. The proposed project would include 8.37 acres and serve 1,215 students, yielding a student-per-acre density of approximately 145, which falls within the CDE Small School Site Guidelines requirements. A project alternative that utilized 25 percent less land (approximately 6.25 acres) while retaining the same number of classrooms and students would yield a student per acre density of approximately 195 students, which greatly exceeds the CDE Small School Site guidelines requirements.

"An EIR is not required to consider alternatives which are infeasible." (Guidelines, § 15126.6, subd. (a).) "Among the factors that may be taken into account when addressing the feasibility of alternatives are site suitability [and] . . . regulatory limitations . . . ." (*Id.*, subd. (f)(1).) Here, the LAUSD concluded that the range of alternatives should not include a reduced project alternative that exceeded the density requirements described in the Small Site School Guidelines. The LAUSD reasonably determined that such a project might prove infeasible insofar as it conflicted with regulatory guidelines on school selection requirements. (*California Native Plant Society, supra,* 177 Cal.App.4th at p. 988 ["The selection will be upheld, unless the challenger demonstrates 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' [Citation.]"].)[26]

---

[26] We recognized that the Small School Site Guidelines are not mandatory. The guidelines state: "These guidelines are advisory only and utilization or compliance is not required by regulation or CDE. CDE's discretionary approval of exemption requests will be determined by specific circumstances on a case-by-case basis. For requests following this guidance, CDE should reasonably be able to determine if an exemption is approvable. Requests using other methods demonstrating compliance with the exemption provisions . . . may also be submitted and be subject to other appropriate agency or expert review and consultation as determined necessary by CDE." These comments demonstrate that although exemption requests that do not follow the guidelines will not automatically be rejected, such a request will likely require special justification. (See <http://www.cde.ca.gov/ls/fa/sf/smallschoolsite.asp> [as of July 18, 2012].)

b. *The Record Contains Substantial Evidence Supporting the LAUSD's Decision Not to Pursue Site No. 26*

The trial court also concluded that the FEIR should have "examined [Site No. 26] in much greater detail." More specifically, the court concluded that the record did not contain substantial evidence supporting the FEIR's assertion that Site No. 26 would have (1) greater impacts to pedestrian safety due to "a high volume of truck traffic" and (2) greater impacts associated with hazardous materials based on its proximity to industrial facilities.

The administrative record, however, demonstrates that the LAUSD conducted an extensive preliminary investigation of Site No. 26, which revealed problems with truck traffic and hazards from industrial facilities. On March 24, 2009, the deputy director of LAUSD's Office of Environmental Health and Safety (OEHS) sent the LAUSD Board of Education a memorandum summarizing "preliminary screening evaluations at several potential sites for the proposed SRHS 8 project," including Site No. 26. The memorandum reported that Site No. 26 "consists wholly of industrial properties" and that the CDE had "recommended the District not pursue the site further because of heavy truck traffic and existing heavy industrial use in the surrounding area."

The memorandum also stated that an environmental database report "found that there were potential releases from historical and current industrial operations on and adjacent to the site. The draft [health risk assessment] identified significant diesel emissions from nearby businesses" that might be mitigated with "enhanced filtration and site design." The memorandum also reported that "a business that utilizes large quantities of ammonia has been identified across the street from the site. This operation presents a significant risk to school occupants should an accident occur. No feasible onsite mitigation has been identified to reduce this risk."

The OEHS memorandum was accompanied by a copy of the "site review" conducted for Site No. 26, which verified and expanded on the statements in the memorandum. The site review explained that multiple "commercial properties" on the project site were listed on an environmental database and that a prior "[o]nsite soil clean-up [was] listed at one property." In addition, "[f]our offsite properties have underground storage tanks that have impacted groundwater." The report concluded that, based on the information from the environmental database and "the current/historic commercial/industrial processes conducted at the site," a "Phase I Environmental Site Assessment and Preliminary Endangerment Assessment" would likely be necessary.

The administrative record also contains a copy of the health risk assessment for Site No. 26 that was referenced in the site review document. The

study, which was prepared by PCR Services Corporation, states that "127 potential air toxic emitting facilities were located within a ½ mile radius . . . of the proposed site" and that, "without mitigation[,] measure[d] carcinogenic risks would exceed acceptable limits for both adults and student receptors." The study also concluded that "Diesel Particulate Matter is the largest contributor to total cancer risk" and that "sources within the proposed school site vicinity would pose a significant baseline health risk to both the staff and students of the SRHS 8 and mitigation would be required." The study further noted that the project site was located near a facility that contained an ammonia tank and that students and staff would likely be affected if there was a "catastrophic" leak from that tank.

Finally, the record contains the CDE's own evaluation of Site No. 26. The evaluation recommended that "the school district no longer pursue acquiring site #26 due to the heavy truck traffic that exists and the area is an exceptionally large industrial area." The CDE's evaluation was accompanied by notes from a "field review" conducted by the CDE's school facilities planning division. The handwritten review indicated that there was "excessive truck traffic" at the site that would present a "safety problem for students." The field review also noted that the site was located in an "industrial area" that was not "conducive to a learning environment."

The documents summarized above, all of which appear in the record, constitute substantial evidence supporting the FEIR's statements and assessment of Site No. 26.

#### c. *The LAUSD Was Not Required to Consider Other Alternative Sites Proposed by Maywood*

Maywood argues that the LAUSD was also required to consider two alternative sites proposed in its comments, which include (1) building the project at an alternative site located in Bell, California, and (2) building an annex to an existing high school (Maywood Academy). Although the trial court did not find that the LAUSD was required to consider either of these alternatives, Maywood contends that it had the duty to do so.[27]

 CEQA does not require that an agency consider specific alternatives that are proposed by members of the public or other outside agencies. Rather,

---

[27] Maywood's brief in support of its petition for writ of mandate specifically argued that the LAUSD was required to consider the Bell site alternative and the "Maywood Academy Annex" alternative. Although the trial court did not directly address either argument, its order stated that "[t]o the extent that a certain objection is not discussed, the Court does not believe that the Respondents have violated CEQA." The court reiterated this at the hearing, stating that any argument that was not specifically addressed in the order was deemed to be "without merit."

the EIR need only discuss "a range of reasonable alternatives." (Guidelines, § 15126.6, subd. (a).) "To be legally sufficient, the consideration of project alternatives in an EIR must permit informed agency decisionmaking and informed public participation. [Citations.] . . . We judge the range of project alternatives in the EIR against 'a rule of reason.' [Citation.] The selection will be upheld, unless the challenger demonstrates 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' [Citation.]" (*California Native Plant Society, supra*, 177 Cal.App.4th at p. 988.)

This FEIR contains a reasonable range of alternatives. It compared and contrasted several project alternatives, including a no project alternative, a Reduced Project alternative and four alternative sites located in Maywood and Vernon. Two of these four alternative locations were specifically proposed by Maywood. The FEIR contains a discussion of the impacts of each alternative, and compares those impacts to the proposed project. It also includes a 12-page table providing a side-by-side comparison of the environmental effects of each alternative and the proposed project. This array of alternatives "represent[s] enough of a variation to allow informed decisionmaking." (*Mann v. Community Redevelopment Agency* (1991) 233 Cal.App.3d 1143, 1151 [285 Cal.Rptr. 9] (*Mann*) [four alternatives enough to permit informed decisionmaking].)

Maywood has presented no argument or information that supports a contrary conclusion. As stated above, if an EIR discusses a reasonable range of alternatives, it is not rendered deficient merely because it excludes other potential alternatives. Maywood has failed to explain why the four alternative locations selected by LAUSD constituted a "manifestly unreasonable" range of alternatives. (*California Native Plant Society, supra*, 177 Cal.App.4th at p. 988.) Instead, it argues that, in addition to these alternative locations, the LAUSD should have also considered the Bell site and the Maywood Academy Annex proposal. CEQA imposes no such requirement.

Maywood has also failed to introduce any evidence substantiating its claims that the Bell site or the Maywood Academy Annex were feasible, adequate alternatives. With respect to the Bell site, the LAUSD informed Maywood that, on November 9, 2009, the Board of Education had approved that location for the Bell Education and Career Center, which would "[p]rovide a career technology education and training center for adults and high school students . . . ."[28] An EIR is not required to consider alternatives that

---

[28] LAUSD has requested that we take judicial notice of a notice of determination demonstrating that the LAUSD approved the project site for the Bell Education and Career Center on November 12, 2009. Maywood, however, has never disputed that the LAUSD did in fact approve another project for the site. Therefore, this evidence is unnecessary. (See *People v.*

are infeasible. (Guidelines, § 15126.6, subd. (a).) The "factors that may be taken into account when addressing the feasibility of alternatives" include "regulatory limitations" and "whether the proponent can reasonably acquire, control or otherwise have access to the alternative site." (Guidelines, § 15126.6, subd. (f)(1).) The LAUSD reasonably concluded that it did not have access to the Bell site because another project had already been approved for that same site.

As to the Maywood Academy Annex alternative, Maywood's comments alleged that the LAUSD could simply abandon the proposed project site and attach new classrooms to Maywood Academy. These conclusory statements contain no analysis or evidence demonstrating the feasibility of such a proposal, nor do they demonstrate that the project would be environmentally superior to the proposed project or the alternatives summarized in the FEIR. (*Mann, supra*, 233 Cal.App.3d at p. 1151 [agency was not required to consider proposed alternative where proponent "presented no evidence that their proposal offered 'substantial environmental advantages' over the [proposed project] or the [alternatives in the FEIR]".)

F. *The FEIR's Discussion of Railroad Crossing Hazard and the Ambient Growth Rate*

Maywood argues that the trial court identified two additional defects in the FEIR that violated CEQA. First, Maywood argues that the court correctly concluded that there is insufficient evidence supporting the FEIR's finding that a railroad line located near the project site will have no significant impacts on pedestrian safety. Second, Maywood asserts that the court properly found that the traffic study on which the FEIR relies failed to explain why it used a 1 percent ambient growth rate in assessing future traffic rates.

Maywood's trial court briefs did not raise either of these issues; its briefs do not even reference the FEIR's findings regarding the railroad line or the ambient growth rate utilized in the traffic study. The trial court's order, however, briefly addresses each issue in footnotes. Although it is difficult to assess whether the court determined that these issues qualified as independent violations of CEQA, the court's peremptory writ states that the LASUD is required to circulate a revised EIR addressing the "CEQA non-compliance issues" identified in the court's order, including deficiencies in the "traffic and rail studies." For the purposes of clarification, we will therefore assess both issues, which have been briefed by the parties.

---

*Danielson* (1992) 3 Cal.4th 691, 704–705 [13 Cal.Rptr.2d 1, 838 P.2d 729] [declining to take judicial notice of evidence that was "proper subject of judicial notice," but "unnecessary" to resolve the legal issue], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

1. *Substantial Evidence Supports the FEIR's Conclusion That a Railroad Line Near the Project Site Will Have No Significant Impacts*

In its analysis of potential impacts from hazards and hazardous materials, the FEIR noted that there was a "railroad easement . . . located approximately 1,125 feet northeast of the project site. . . . [¶] The nearest crossing is 1,185 feet to the northeast at Heliotrope Avenue. Safety features at the Heliotrope crossing are not adequate to meet the safety needs of motorists and pedestrians who cross these tracks." The FEIR concluded, however, that it was "unlikely that . . . project-related vehicle or pedestrian traffic would use this crossing or that students would attempt to use these tracks as pathways, because the area is only industrial and has no housing north of the tracks." The FEIR found that any hazards associated with the railroad easement would be "less than significant" and would require no mitigation.

In footnote 20 of its order, the trial court commented that the record lacked sufficient evidence supporting the "EIR's assumption that the teenage students will stay away from the railroad tracks and easement that are 1000 feet from the project site." According to the court, "[t]here is . . . absolutely no substantial evidence upon which the EIR bases this key assumption . . . [which] stands in stark contrast to common experience."

The administrative record, however, includes a "Rail Safety Study" conducted by Wilson Geosciences, Inc., that assessed the dangers presented by the railroad line. The rail study, which was included as an appendix to the FEIR, explained that the preparer of the study had "visited the Study Area to observe, assess and document the existing railroad line" and reviewed information pertaining to the railway including, in relevant part "[the d]istance of [the] tracks from [proposed S]ite"; "[i]dentification and description of all warning devices and street and sidewalk conditions at the at-grade crossing"; "Train crossing incident history from the [Federal Railway Association]"; and "[r]eview of evidence of irregular crossing of train tracks (trespassing)."

The report concluded that "[t]he Safety Appliances at the Heliotrope Avenue crossing within the Study Area are not adequate to meet the safety needs of motorists, and pedestrians, who cross these tracks, although it is unlikely that vehicle or pedestrian traffic would use this crossing for this purpose. [¶] It is unlikely that students will attempt to use the easements in the Study Area as pathways to and from [the proposed Project site] since it is so far from the proposed Site and no residential neighborhoods are in the vicinity northeast of the easement."

■ Therefore, the FEIR contains evidence demonstrating that LAUSD retained an expert to assess potential hazards from the railroad line. After conducting an investigation, the expert concluded that, based on the positioning of the tracks and the surrounding area, pedestrians and students traveling to the project site were unlikely to cross the tracks. "The drafters of an EIR may . . . rely upon the credible opinions of experts concerning environmental impacts. [Citation.] [The party challenging the EIR] has the burden on appeal of demonstrating that these sources are so 'clearly inadequate or unsupported' as to be 'entitled to no judicial deference.' [Citation.]" (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1467–1468 [70 Cal.Rptr.3d 59].) Maywood has made no such showing here.

Division 3 of this court considered a similar issue in *Long Beach, supra,* 176 Cal.App.4th 889 and found that an EIR reasonably concluded that the LAUSD did not need to assess potential hazards that existed in areas around a school site that students were unlikely to utilize. The City of Long Beach argued that an FEIR for a new high school had failed to assess "potential dangers facing students who walk through the industrial areas in the east and southeast of the project." (*Id.* at p. 914.) The appellate court ruled that the FEIR adequately assessed those issues, explaining: "The FEIR declares that the only residential areas served by the project lie to the *west* of the site, not in the industrial east and southeast of the school. . . . To the degree that students might reside to the east and southeast of the project, they would attend schools in Long Beach and not LAUSD. The FEIR reasonably declares that 'No students are expected to travel from the southeast or east of the project site since those areas are served by the Long Beach Unified School District.' After surveying the eastern boundary of the site, the FEIR finds that the industrial land uses bordering the rail line to the east preclude pedestrian access to the proposed site." (*Id.* at pp. 914–915.)

Similarly, the FEIR here concludes that students and pedestrians traveling to the project site are unlikely to encounter the rail crossing on Heliotrope Avenue because "the area is only industrial and has no housing north of the tracks." This conclusion is both reasonable and supported by expert opinion.

> 2. *The Record Contains Substantial Evidence Supporting the Traffic Study's Decision to Utilize a 1 Percent Ambient Growth Rate*

Footnote 18 of the trial court's order concludes that the FEIR's traffic study was flawed because it failed to explain why it elected to use a 1 percent ambient growth rate in calculating future traffic projections. In support, the court cited various sections of the FEIR stating that "[a]n ambient growth factor of one percent per year was applied to adjust the exiting year 2009

traffic volumes to reflect the effects of regional growth and development in the project vicinity by the year 2013." According to the court, the traffic study "makes assumptions regarding future growth predicated on no objective information" and therefore does not qualify as "substantial evidence upon which an expert can base a conclusion."

Although the court is correct that the FEIR did not explain how the ambient growth figure was arrived at, the traffic study, which was included as an appendix, did contain an explanation of the issue. The study states, in relevant part: "[A]mbient growth in traffic . . . reflects general increases in traffic due to regional growth and development. . . . [¶] Existing traffic is expected to increase between the year 2009 and the year 2014 as a result of general areawide and regional growth and development. An ambient growth factor of 0.71% per year (3.55% total) over the five-year period was applied to adjust the existing year 2009 traffic volumes to reflect the effects of regional growth and development in the project vicinity by the year 2014. The source for this ambient growth factor is the projected growth rate for the Gateway Cities region provided in the . . . 2004 *Congestion Management Program (CMP) for Los Angeles County (Metro, 2004)*. To be conservative, the 3.55% total growth rate was rounded to 4.0%." (Italics added.)

Under Government Code section 65089, subdivision (a), the County of Los Angeles (and every other county with an urban area) is required to prepare a "Congestion Management Program" (CMP), which must include a wide array of information pertaining to local traffic conditions. Section 65089 also imposes detailed requirements governing the methodology used to develop the traffic data appearing in a CMP. (See Gov. Code, § 65089, subd. (c).) Thus, there is substantial evidence in the record showing that the ambient growth rate utilized in the traffic study was in fact based on "objective information."

Generally, "[c]hallenges to the scope of the analysis, the methodology for studying an impact, and the reliability or accuracy of the data present factual issues, so such challenges must be rejected if substantial evidence supports the agency's decision as to those matters and the EIR is not clearly inadequate or unsupported . . . ." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 [100 Cal.Rptr.2d 301].) As explained by our Supreme Court, " '[t]he court does not have the duty of passing on the validity of the conclusions expressed in the EIR, but only on the sufficiency of the report as an informative document.' . . . [¶] . . . [T]he issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the [agency's] finding[s] . . . ." (*Laurel Heights I, supra*, 47

Cal.3d at p. 409.) A party challenging a particular study must show that it is "clearly inadequate or unsupported." (*Id.* at p. 409, fn. 12.)

In this case, the FEIR's decision to use a 1 percent ambient growth rate was supported by substantial evidence. Moreover, Maywood has offered no evidence demonstrating why the traffic study's reliance on the CMP was improper. In effect, Maywood asks this court to disregard the traffic evidence presented by LAUSD's experts because it disagrees with them. That is not sufficient to establish a CEQA violation.[29]

### G. *LAUSD's Approval of the FEIR Did Not Violate the Education Code*

Maywood's petition for writ of mandate alleges that, in addition to violating CEQA, the LAUSD's certification of the FEIR and approval of the project site violated Education Code sections 17211 and 17213.1, which require school districts to complete certain steps before acquiring a school site. The trial court agreed, ruling that the LAUSD "violated . . . the Education Facilities Code with regards to the approvals issued for the project and the certification of the EIR." Education Code sections 17211 and 17213.1 impose requirements that a school district must fulfill before acquiring a school site, not prior to the certification of an EIR or approval of the project.

### 1. *Summary of Education Code Sections 17211 and 17213.1*

Education Code section 17211 states that, "[p]rior to commencing the acquisition of real property for a new schoolsite or an addition to an existing schoolsite, the governing board of a school district shall evaluate the property at a public hearing using the site selection standards established by the State Department of Education pursuant to subdivision (b) of [Education Code] Section 17251." Those site selection criteria are set forth in California Code of Regulations, title 5, sections 14010 and 14011. Section 14010 lists various technical standards applicable to school sites (minimum acreage,

---

[29] Maywood also argues that the traffic study must recalculate the ambient growth rate to address cumulative impacts from the I-710 expansion project. The traffic study makes clear, however, that projecting future traffic rates requires consideration of two independent elements: "First, is the ambient growth in traffic, which reflects general increases in traffic due to regional growth and development. The second source is traffic generated by specific future projects located within, or in the vicinity of the study area." Thus, although cumulative impacts from the I-710 project might alter future traffic projections resulting from future projects, nothing in the record supports the assertion that it would affect the appropriate ambient growth rate. As discussed above, we have concluded that the FEIR must include a more detailed discussion explaining the evidence the LAUSD relied on in concluding that it was unnecessary to consider the cumulative impacts of the I-710 project. That finding, however, has no impact on the propriety of the ambient growth rate used in the traffic study.

required investigation of hazards, etc.) while section 14011 requires that a state-funded school district (of which LASUD is one) obtain written approval from the CDE "before acquiring title to real property for school use."

■ Education Code section 17213.1 requires that, as a condition of receiving state funding, a school district shall comply with various environmental assessments "prior to the acquisition of a schoolsite, or if the district owns or leases a schoolsite, prior to the construction of a project." Those assessments include conducting an environmental site assessment and, if necessary, a preliminary endangerment assessment. (Ed. Code, § 17213.1, subd. (a).) If a PEA is required and concludes that a release of hazardous materials has occurred, the district must prepare a financial analysis of cleanup, assess the benefits that accrue from using the proposed school site versus other alternatives and obtain approval of the CDE that the proposed site meets the school site selection criteria in Education Code section 17251, subdivision (b). (Ed. Code, § 17213.1, subd. (a)(10).)

### 2. LAUSD's Certification of the FEIR and Approval of the Project Site Did Not Violate Education Code Section 17211 or Section 17213.

The trial court ruled that the LAUSD violated Education Code sections 17211 and 17213.1 when it approved the FEIR and the project site without (1) adequately investigating pedestrian safety hazards caused by the design of the project; (2) conducting a financial analysis estimating the cost of remediating the site; (3) assessing the benefits of the proposed site versus other alternative sites; and (4) obtaining CDE approval that the school site met applicable school siting criteria.

■ Neither Education Code section 17211 nor section 17213.1 states that a school district must comply with the requirements described therein prior to certifying the FEIR or approving the project. Instead, the statutes state that those requirements must be fulfilled before the district acquires the school site. If the Legislature wanted to require school districts to comply with the requirements of sections 17211 and 17213.1 before certifying an EIR or approving a project, it could have said as much. The Legislature, however, only chose to impose such requirements prior to acquiring the proposed school site.

While the record suggests that the LAUSD has taken several actions to acquire the school site, including the initiation of numerous eminent domain proceedings, none of those actions are challenged here. Instead, Maywood's petition only challenges the LAUSD's decisions to certify the FEIR and approve the project site. Neither of those actions is sufficient to trigger a violation of Education Code section 17211 or section 17213.1.

### H. *The Trial Court's Order Awarding Maywood Attorneys' Fees Is Reversed*

The LAUSD has also appealed the trial court's order awarding Maywood approximately $670,000 in attorneys' fees pursuant to section 1021.5.[30] In light of the fact that we have reversed significant portions of the trial court's order on Maywood's petition for writ of mandate, the order granting attorneys' fees must also be reversed.[31] Any grant or denial of attorneys' fees under section 1021.5 must follow the entry of judgment on remand and must be based on the more limited results obtained in the new judgment.

In the proceedings at the trial court, the LAUSD's primary argument in opposition to the motion for attorneys' fees was that Maywood had not satisfied the "necessity and financial burden" criteria of section 1021.5 because the city had a personal interest in the litigation—preservation of its tax base—that transcended the burdens of enforcement. In its appellate brief, the LAUSD has expanded on this argument, asserting that Maywood cannot recover fees under section 1021.5 because "the primary purpose" of the lawsuit "was to benefit Maywood [and its constituents], whether for financial or other reasons." Maywood, however, contends that (1) its nonfinancial interests in pursuing the litigation are not relevant to determining whether it has satisfied section 1021.5's "necessity and financial burden" criteria, and (2) its financial interests in the litigation were "negligible" and therefore did not preclude recovery of attorneys' fees.

Because the same question may be presented to the trial court should Maywood elect to seek attorneys' fees on remand, we will address how section 1021.5's "necessity and financial burden" criteria should be evaluated in the context of this case.

#### 1. *Summary of Section 1021.5*

Section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in

---

[30] The LAUSD filed separate notices of appeal with respect to the trial court's judgment and its subsequent order awarding attorneys' fees. The two appeals were assigned different case numbers, B233739 and B236408. In an order dated November 16, 2011, we denied the LAUSD's motion to consolidate the appeals, but ordered that we may consider the appeals concurrently "for the purposes of oral argument and decision."

[31] In the trial court, Maywood argued that it was entitled to attorneys' fees because it had prevailed on the "primary basis [of its] CEQA petition," which was LAUSD's "failure to comply with the alternatives requirements of CEQA." We have, however, reversed that portion of the trial court's ruling. We have also reversed the trial court's findings that (1) the FEIR did not adequately discuss hazardous materials contamination at the project site; (2) the FEIR should have included a cumulative impacts analysis of the I-710 corridor project; (3) the LAUSD violated the Education Code; and (4) the LAUSD's traffic study and railway safety study were deficient.

any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities . . . unless one or more successful parties and one or more opposing parties are public entities . . . ."

 Thus, "[t]o obtain attorney fees under section 1021.5, the party seeking fees must show that the litigation: ' " ' "(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) [was necessary and] imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter." [Citation.]' [Citation.]" ' [Citations.] Because the statute states the criteria in the conjunctive, each must be satisfied to justify a fee award. [Citations.]" (*RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 775 [96 Cal.Rptr.3d 362] (*RiverWatch*).)

LAUSD contends that Maywood cannot satisfy the "necessity and financial burden" criteria of section 1021.5 because the lawsuit was brought solely to benefit Maywood and its residents, "whether for financial or other reasons." More specifically, LAUSD asserts that the evidence shows Maywood pursued the litigation to preserve its tax base and to protect its citizens' interests in ensuring that the environmental consequences of the project were fully disclosed and adequately investigated.[32]

### 2. Conservatorship of Whitley, supra, *50 Cal.4th 1206*

 In *Conservatorship of Whitley, supra*, 50 Cal.4th at p. 1214 (*Whitley*), the California Supreme Court clarified the proper method of evaluating the

---

[32] Some language in the LAUSD's appellate brief suggests that it is also arguing that Maywood failed to show that the litigation conferred a significant benefit upon the public because the record demonstrates that Maywood pursued the case for its own personal interests. Subdivision (a) of section 1021.5, however, does not require the claimant to show that he or she *pursued* the litigation to confer a significant benefit on the general public; it merely requires that the claimant show "a significant benefit . . . has been conferred on the general public or a large class of persons . . . ." Therefore, under the plain language of the statute, the claimant need only show that it conferred a significant benefit on the public. The claimant's subjective motivations in pursuing the litigation are simply not relevant to that inquiry. (Cf. *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1217, 1219 [117 Cal.Rptr.3d 342, 241 P.3d 840] [§ 1021.5 "does not focus on litigants' initial subjective motivation—on what may cause them to want to bring a public interest lawsuit"].)

"necessity and financial burden" element of section 1021.5, which has traditionally "been deemed satisfied ' "when the cost of the claimant's legal victory transcends his personal interest.' " ' [Citations.]" (*People ex rel. Brown v. Tehama County Bd. of Supervisors* (2007) 149 Cal.App.4th 422, 453 [56 Cal.Rptr.3d 558] (*Tehama County*).) Prior to *Whitley*, appellate courts were divided as to whether it was proper to consider a claimant's nonpecuniary "personal interests" when applying the financial burden element. (Compare *RiverWatch, supra*, 175 Cal.App.4th at pp. 776–777 ["Although cases refer to this requirement as the 'financial burden' criterion, nothing in the language of section 1021.5 'confines the consideration of the necessity and financial burden clause to just financial interests.' [Citation.]"] with *Phipps v. Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110, 1122–1123 [251 Cal.Rptr. 720] ["The fact [plaintiff] had a personal stake in the outcome of the litigation is irrelevant. . . . '[S]ubdivision (b) of section 1021.5 focuses not on plaintiffs' abstract personal stake, but on the financial incentives and burdens related to bringing suit.' "].) *Whitley* resolved the dispute, holding that "a litigant's personal nonpecuniary motives may not be used to disqualify litigant from obtaining fees under . . . section 1021.5." (*Whitley, supra*, at p. 1211.)

The plaintiff in *Whitley*, Virginia Maldonado, served as conservator for her developmentally disabled brother. In the underlying litigation, Maldonado successfully challenged certain procedures used to transfer her brother to a new medical facility. Maldonado then filed a section 1021.5 motion arguing that "[a]n award [of attorneys' fees] was warranted . . . because '[the decision] created a procedural precedent that . . . conferred a significant benefit on . . . a large class of persons' " and " 'transcended her personal interest in [her brother's] welfare.' " (*Whitley, supra*, 50 Cal.4th at p. 1213.) The defendant opposed the motion, arguing that "the financial burden imposed on Maldonado was not out of proportion to her personal interest in blocking her brother's transfer." The trial court agreed and denied the motion. (*Ibid.*)

On appeal, Maldonado argued that "section 1021.5's requirement that fees be awarded only when the 'necessity and financial burden of private enforcement . . . make the award appropriate' means that litigants may not be eligible for attorney fees when they have an individual *pecuniary* stake in the litigation, but that litigants may not be disqualified [from recovering fees] simply because they have a personal, nonpecuniary interest. Because Maldonado did not have a pecuniary interest in the litigation, but only an interest related to her brother's welfare, she argued that she met the 'necessity and financial burden' requirement. The Court of Appeal disagreed, holding . . . that a strong nonpecuniary personal interest in the litigation . . . could disqualify a litigant from obtaining attorney fees under section 1021.5." (*Whitley, supra*, 50 Cal.4th at p. 1213.)

█ The Supreme Court reversed, holding that a litigant's "nonpecuniary interests [do not] affect his or her eligibility for section 1021.5 fees." (*Whitley, supra*, 50 Cal.4th at p. 1217.) The court provided three reasons in support of its holding. First, it found that the "literal language" of the statute supported Maldonado's interpretation. (*Ibid.*) The court explained that, contrary to the conclusion reached by some appellate courts, the phrase "the necessity and financial burden of private enforcement" (*id.* at p. 1214) is comprised of two distinct elements: a necessity prong and a financial burden prong.[33] The court found that the first prong "simply [requires a showing] that public enforcement is not available, or not sufficiently available" (50 Cal.4th at p. 1217), while the second prong requires a showing that " ' "the financial burden . . . [was] such that an attorney fee award [was] appropriate in order to assure the effectuation of an important public policy" ' [citations]" (*id.* at p. 1216).[34] According to the court, "a strong nonfinancial motivation does not change or alleviate the 'financial burden' that a litigant bears. Only offsetting pecuniary gains can do that." (50 Cal.4th at p. 1217.)

Second, the court ruled that the legislative history of section 1021.5 demonstrated that the statute was intended to alleviate the financial burdens associated with public interest litigation. The court found it "noteworthy that the . . . legislative history does not focus on litigants' initial subjective motivation—on what may cause them to want to bring a public interest lawsuit. What section 1021.5 does address is the problem of affordability of such lawsuits. . . . [T]he Legislature that enacted section 1021.5 was not so much concerned with what brought a litigant with a potential public interest case into an attorney's office, but rather with allowing that litigation to move forward from there by offering at least the prospect that the financial burden of the litigation could be shifted to the opposing party if the litigant prevailed." (*Whitley, supra*, 50 Cal.4th at pp. 1219–1220.)

Third, the court found that it would be "inherently problematic to forge a coherent doctrine around the notion that nonpecuniary interests may disqualify litigants from section 1021.5 fees." (*Whitley, supra*, 50 Cal.4th at p. 1225.) The court explained that determining whether a particular "nonpecuniary" interest was sufficient to preclude recovery under section 1021.5 would require a "speculative [inquiry] lacking in objective criteria." (50 Cal.4th at p. 1225.) The court also found that "nonpecuniary" benefits such as " 'environmental or aesthetic interests are not easily quantified so as to

---

[33] In so holding, the court rejected a line of cases ruling that " '[t]he addition of the word "necessity" suggests . . . that factors beyond just "financial burden" also may be looked at.' [Citation.]" (*Whitley, supra*, 50 Cal.4th at p. 1217.)

[34] LAUSD has raised no issue regarding the "necessity" prong of section 1021.5, subdivision (b), which, in the context of litigation between public entities, requires the claimant to show that "public enforcement—that is, enforcement by one public entity against another—was necessary." (*Tehama County, supra*, 149 Cal.App.4th at p. 452.)

compare them to the cost of litigation.' . . . Without any objective basis for quantification, we are left with the subjective opinions of trial courts, which well may vary considerably." (*Ibid.*)

### 3. Whitley *Applies in the Context of Public Enforcement Actions*

The *Whitley* decision makes clear that, in a private enforcement action, a court may not consider nonpecuniary interests when evaluating the financial burden criterion in section 1021.5. The decision does not, however, explain whether its holding is intended to apply to public enforcement cases where, as here, a public entity has pursued attorneys' fees against another public entity.[35] Although we are not aware of any decision that has considered whether *Whitley*'s holding applies in the context of public enforcement actions, we conclude that it does.

All of the factors the court discussed in concluding that nonpecuniary interests may not preclude a private litigant from obtaining fees under section 1021.5 apply equally to public entity litigants. First, the statutory language contains no indication that the Legislature intended to apply a different standard to successful public entities than to successful private parties. Section 1021.5, subdivision (b) requires a showing that "the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate . . . ." The Legislature employed the same language, "the necessity and financial burden of . . . enforcement . . . are such as to make the award appropriate . . ." (§ 1021.5), to describe the substantive requirement for both private parties and public entities. The fact that the statutory phrase "enforcement by one public entity against another public entity" (*ibid.*) does not precisely parallel the statutory reference to "private enforcement" (*ibid.*) merely reflects the restriction stated elsewhere in the statute that fees are available to a public entity only in litigation against another public entity; this does not alter the substantive requirement.[36]

Second, the legislative history of the 1993 amendment, which expanded section 1021.5 to permit public entities to recover attorneys' fees, indicates that the Legislature intended that the same requirements should apply to private and public litigants. The Legislative Counsel's Digest comments

---

[35] "[S]ection 1021.5 originally precluded public entities from receiving fees under the statute. [Citation.] In 1993, however, the Legislature amended the statute to its present form, which allows a public entity to recover attorney fees from another public entity. [Citation.]" (*Tehama County, supra*, 149 Cal.App.4th at p. 450.)

[36] "With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, . . . unless one or more successful parties and one or more opposing parties are public entities . . . ." (§ 1021.5.)

accompanying the 1993 amendment state that, "[u]nder existing law, a court may award attorney's fees to a successful party in an action which has resulted in the enforcement of an important right affecting the public if certain conditions are met, but these attorney's fees cannot be awarded to a public entity. [¶] This bill would permit award of attorney's fees to public entities under these provisions, as specified, if the award is against another public entity." (See Legis. Counsel's Dig., Sen. Bill No. 764 (1993–1994 Reg. Sess.) Stats. 1993, Summary Dig., p. 255.) Similarly, a Senate bill analysis of the amendment summarized the requirements of section 1021.5 and explained that "this bill would allow attorneys' fees to be granted to public entities under the above stated provision if the award is against another public entity." (Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 764 (1993–1994 Reg. Sess.) Sept. 2, 1993.) Finally, an Assembly bill analysis explained that "the author believes that the current exclusion in Section 1021.5, which prohibits the award of 'private attorney general' fees to any public entity under all circumstances, is unfair. . . . The opportunity to be awarded 'private attorney general' fees will enable small public entities to resist large, well-financed public entities . . . [¶] [t]he author notes that the award, if any, remains discretionary with the court and must meet all other existing criteria." (Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 764 (1993–1994 Reg. Sess.) as amended Sept. 2, 1993, p. 1.) These sources demonstrate that the Legislature intended that private and public litigants would be subject to the same criteria under section 1021.5.

▮ Third, the Supreme Court's concern that attempting to quantify and weigh the sufficiency of a private litigant's nonpecuniary interests would present "inherent[]" difficulties applies equally to cases involving public entities. (*Whitley, supra,* 50 Cal.4th at p. 1225.) A nonpecuniary benefit such as improved "aesthetic[s]" is no more quantifiable merely because it is being pursued by a public, rather than a private party. (*Ibid.*) We therefore conclude that the holding of *Whitley* applies equally to both private and public litigants who seek attorneys' fees pursuant to section 1021.5.

### 4. *LAUSD Relies on Authorities That Predate* Whitley

▮ LAUSD argues that Maywood cannot satisfy the necessity and financial burden criteria because the record shows that it pursued the litigation to protect various interests of its citizenry including, in relevant part (1) preserving Maywood's tax base, (2) protecting residents from being dislocated from their homes, (3) avoiding adverse impacts to the environmental condition and appearance of Maywood, and (4) preserving the city's cultural and historical resources. In support, LAUSD cites a series of public enforcement cases—all of which were decided before *Whitley*—holding that a public

litigant may not obtain fees under section 1021.5 if it pursued the litigation to protect the interests of its constituents.

For example, in *County of Inyo v. City of Los Angeles* (1978) 78 Cal.App.3d 82 [144 Cal.Rptr. 71] (*County of Inyo*), Inyo sought attorneys' fees under the " 'private attorney general' theory" (*id.* at p. 89) after successfully challenging an EIR analyzing the City of Los Angeles's "increased extraction and use of Owens Valley groundwater." (*Id.* at p. 85.)[37] Inyo argued that its lawsuit had obtained "statewide values" by "pressur[ing]" the City of Los Angeles to "impose water consumption limits on its customers during the 1976–1977 drought" and furthering "statewide polic[ies] of water conservation." (78 Cal.App.3d at pp. 89–90.)

The appellate court, however, concluded that, even assuming the benefits of the suit "flowed statewide" (*County of Inyo, supra,* 78 Cal.App.3d at p. 90), Inyo had failed to demonstrate that the "cost of [its] legal victory transcend[ed its] personal interest . . . in the matter." (*Id.* at p. 89.) The court explained that Inyo had "failed to establish that [the benefits obtained in the suit] were disproportionately important and valuable in comparison to its own. A county is a political subdivision of the state which provides state and local governmental services for its inhabitants. [Citation.] Inyo County went to court as champion of local environmental values, which it sought to preserve for the benefit of its present and future inhabitants. This action is not a 'public interest' lawsuit in the sense that it is waged for values other than the petitioner's. The litigation is self-serving. The victory won by the county in 1977 bulked large enough to warrant the cost of winning it. The necessity for enforcement by Inyo County did not place on it 'a burden out of proportion to [its] individual stake in the matter.' [Citation.]" (*Id.* at p. 90.)

In a second case, *City of Hawaiian Gardens v. City of Long Beach* (1998) 61 Cal.App.4th 1100 [72 Cal.Rptr.2d 134], ". . . Hawaiian Gardens successfully sued to prevent Long Beach from closing a road at the border between the two cities, which would have diverted traffic onto residential streets in Hawaiian Gardens and increased the likelihood of accidents on a street bordering a park and an elementary school. [Citation.] On appeal from the trial court's denial of attorney fees under Code of Civil Procedure section 1021.5, the appellate court affirmed, noting: 'The record establishes that Hawaiian Gardens and its citizens received a substantial benefit when the proposed closure of Pioneer Boulevard was blocked. We agree with the trial court that while the judgment was of regional benefit, there is no showing

---

[37] *County of Inyo* was decided prior to the passage of section 1021.5 and was based on the judicially recognized "private attorney general rule." (See *Serrano v. Priest* (1977) 20 Cal.3d 25, 46–47 [141 Cal.Rptr. 315, 569 P.2d 1303]; *County of Inyo, supra,* 78 Cal.App.3d at pp. 88–89.)

that the burden of the litigation transcended Hawaiian Gardens' interest in the controversy. . . ." (*Tehama County, supra,* 149 Cal.App.4th at pp. 455–456.)

In a third case, *Tehama County, supra,* 149 Cal.App.4th 422, the appellate court explained that the holdings in *County of Inyo* and *Hawaiian Gardens* demonstrated that the "the traditional financial burden criterion in Code of Civil Procedure section 1021.5 can easily be applied to public entities that are political subdivisions of the state . . . . In such a case, the pertinent question is whether the public entity deserves a reward for pursuing litigation that was in the interest of a greater spectrum of the public than its own constituents." (*Id.* at p. 456.)

 *County of Inyo, Hawaiian Gardens* and *Tehama County* indicate that, when applying section 1021.5's "financial burden" criterion to political subdivisions, the trial court should consider whether the burden of the litigation transcended the interests of both the political entity and the collective interests of the individuals that the entity represents. We agree with that conclusion.

The cases do not address whether the "personal interests" being pursued by the public entity plaintiff were "pecuniary" or "nonpecuniary" in nature. Instead, they simply conclude that the public entity failed to satisfy the necessity and financial burden prong because it acted to protect the general interests of its citizens. *County of Inyo,* for example, explained that the county was precluded from collecting attorneys' fees because it had been acting as a "champion of local environmental values, which it sought to preserve for the benefit of its present and future inhabitants." (*County of Inyo, supra,* 78 Cal.App.3d at p. 90.) *Hawaiian Gardens,* on the other hand, concluded that attorneys' fees were improper because the city was attempting to protect its residents from hazards associated with increased traffic.

 *Whitley* has since clarified that a litigant's nonpecuniary interests are not relevant in evaluating section 1021.5's financial burden criterion. Therefore, when assessing this factor in the context of a public entity's legal victory, the trial court may only consider the public entity's pecuniary interests and the pecuniary interests of its constituents. To the extent *County of Inyo, Hawaiian Gardens* and *Tehama County* suggest otherwise, that suggestion does not survive *Whitley.*

### 5. *Summary of Issues on Remand*

If Maywood elects to renew its motion for attorneys' fees on remand, the trial court should reassess whether fees are appropriate given the outcome of this appeal and, if so, the appropriate amount of any such fees, applying *Whitley.*

## DISPOSITION

The judgment is reversed in part and affirmed in part, and the matter is remanded to the trial court with directions to enter a new judgment granting in part and denying in part Maywood's petitions for writ of mandate consistent with this opinion. The superior court shall vacate its writ of mandate and issue a new writ consistent with the views in this opinion. Such order shall include only those mandates necessary to achieve compliance with CEQA in accordance with this opinion. The trial court's order awarding attorneys' fees is reversed and remanded for further proceedings. The parties shall bear their own costs on appeal.

Perluss, P. J., and Woods, J., concurred.

A petition for a rehearing was denied August 14, 2012, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied November 28, 2012, S205521.